Andrew **ALLOCCO**, Abraham Fernandez, Steny Garcia–Montes, Agustin Quevedo, Alex Silva, Manuel Montalvo, and John Allen, Plaintiffs,

v.

**CITY OF CORAL GABLES, A Municipal Corporation, and the University of Miami, A Non–Profit Florida Corporation, Defendants.**

No. 99–2443–CIV.

United States District Court,
S.D. Florida.

Aug. 23, 2002.

Rebecca Hope Fischer, Esq., Martin E. Feldman, Attorneys for Andrew Allocco, Abraham Fernandez, Steny Garcia–Montes, Alex Silva, John Allen, Fischer & Feldman, Hollywood, Bruce Howard Lehr, Esq., Co–Attorney for Andrew Allocco, Abraham Fernandez, Steny Garcia–Montes, Alex Silva, John Allen, Fischer & Feldman, Lehr & Gasalla, Miami, for Plaintiffs.

James C. Crosland, Esq., Attorney for City of Coral Gables, Muller Mintz, Miami, James Clark Polkinghorn, Esq., Attorney for University of Miami, Fisher & Phillips, Ft. Lauderdale, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

**THIS CAUSE** is before the court upon the joint motion for summary judgment (DE # 213) filed by the defendants, the University of Miami ("UM") and the City of Coral Gables ("the City") (collectively "the defendants"). The plaintiffs, Andrew Allocco ("Allocco"), Abraham Fernandez ("Fernandez"), Steny Garcia–Montes ("Garcia–Montes"), Alex Silva ("Silva"), and John Allen ("Allen"), filed a fifth amended complaint against the defendants, alleging as follows: count I, negligent misrepresentation (against UM); count II, retaliation in violation of First Amendment rights (by Allocco and Fernandez against the City); count III, conspiracy (against UM);[1] count VI (first), whistleblower claim in violation of Fla. Stat. §§ 448.102 *et seq* (by Allocco and Fernandez against UM).; count VI (second), violation of Florida's Racketeer Influence and Corrupt Organizations Act ("RICO") act, Fla. Stat. §§ 895.01 *et seq.* (against UM); count VII, violation of due process rights under the Fourteenth Amendment through a deprivation of a property and liberty interest (by Allocco and Fernandez against the City); count VIII, whistleblower claim in violation of Fla. Stat. §§ 112 *et seq.* (by Allocco and Fernandez against UM and the City); and count IX, violation of 42 U.S.C. § 1983 (by Allocco and Fernandez against the City). Through these claims, the plaintiffs, who were employed as UM public safety officers and part-time law enforcement officers of the City, seek to obtain the same benefits and pay as full-time City officers.

The defendants request summary judgment on each count of the complaint. They argue that the plaintiffs' misrepresentation, conspiracy, and RICO claims fail as a matter of law because neither the City nor UM ever made any misrepresentations to the plaintiffs. In support of this argument, the defendants have submitted a substantial amount of evidence to show

---

1. Counts IV and V were dismissed with prejudice and are not included in the fifth amended complaint. The plaintiffs incorrectly labeled two claims as "count VI" in their complaint, so the court has relabeled these as count VI (first) and count VI (second).

that the plaintiffs always knew that they were being employed as part-time City officers, not full-time officers. As for the claims asserted by Allocco and Fernandez, the defendants contend that these plaintiffs were terminated because they refused to obey reasonable orders from their commanding officers. The defendants also contend that Allocco's and Fernandez's due process claims fail because they were not deprived of a constitutionally protected property or liberty interest. On July 19, 2002, the court heard oral argument on the defendants' motion for summary judgment. After carefully considering the motion, evidence, and arguments of counsel, the court grants the defendants' motion for summary judgment.

### *Introduction and Procedural History*

The plaintiffs are all current or former public safety officers of UM's Public Safety Department ("UMPSD"). As UMPSD officers, they have been defined in a contract between UM and the City as full time employees of UM who are registered for administrative purposes with the Florida Department of Law Enforcement ("FDLE") as part-time law enforcement officers of the City. The contract between the City and UM took effect in 1969 [2], and all of the plaintiffs were hired after the contract took effect. Through a succession of six complaints, the plaintiffs have attempted to gain the same rights, benefits, and privileges afforded to full-time law enforcement officers employed by the City. The plaintiffs claim that the defendants devised a scheme to deprive them of the same pay, benefits, and privileges as full-time City officers by falsely classifying them as part-time officers. According to the plaintiffs, the label of "part-time" was misleading because they all worked full-time shifts.

The plaintiffs filed their original complaint in state court on November 8, 1996. In their complaint, the plaintiffs asked the court to declare the 1969 contract null and void as an unlawful delegation of power and to declare them full-time law enforcement officers. The plaintiffs also brought a separate action against the City for breach of the collective bargaining agreement between the City and the Fraternal Order of Police, Lodge No. 7. The court dismissed the complaint on jurisdictional and standing grounds.

The plaintiffs amended their complaint on September 24, 1997, and raised new theories of relief. Although the plaintiffs enlisted two UM students to serve as plaintiffs to contest the validity of the 1969 contract, the court dismissed this claim for lack of standing. The plaintiffs also alleged that UM and the City made negligent misrepresentations to them regarding their employment status and the terms and conditions of their employment, but the court dismissed the claim for failure to plead with sufficient particularity.

On January 19, 1998, the plaintiffs filed their second amended complaint, which alleged negligent misrepresentation. On October 7, 1999, the plaintiffs amended their complaint further to assert federal claims. This complaint was removed to federal court.

On September 22, 2000, the plaintiffs filed a fifth amended complaint. Following rulings by this court on the defendants'

---

**2.** The contract was modified in 1977, but it continued to classify UMPSD officers as part-time City officers.

motions to dismiss, counts IV and V were dismissed with prejudice from the fifth amended complaint, and the City was dismissed from counts I and III.

### The Undisputed Facts [3]

### I. Background Facts

#### A. The Relationship Between the City and UM

UM owns a university campus located within the City. In 1969, the City and UM entered into a contract whereby the parties agreed that if UM hired any persons "to act in the capacity of Police Officers", the City would pass on the officer's qualifications and swear him/her in as a "regular" police officer of the City with full arrest powers. (Def. Ex. 22 ¶ 1). The Contract goes on to define the status of such an officer:

> Any Police Officers hired under the terms of this Agreement will be employees of and will be compensated by the University and therefore *will not be eligible for retirement or other benefits which are provided by the City for its employees.* It is contemplated that Police Officers hired by the University and sworn in by the City will perform their functions only on the campus of the University. It is understood, however, that a Police Officer may be required on occasion to exercise his authority off

campus in connection with an occurrence on campus and, further that a Police Officer may be requested by the City to assist other police officers in an emergency situation even if such assistance is rendered off campus. It is understood by both parties that the Police Officers will not be subject to Trial Board hearings and will instead be disciplined by the University, provided, however, that the Chief of Police of the City will have the right to revoke the oath of office of any Police Officer for just cause.

(Def. Ex. 22 at ¶ 2) (emphasis added). The contract also provides that UM would pay for the officers' badges; guns, and uniforms, which would be subject to approval by the City's Chief. (Def. Ex. 22 at ¶ 3).

#### B. UM Officers' Classification for FDLE Purposes

From approximately February 18, 1976, through October of 1976, the City and UM engaged in various conversations with Louis Rausch, the Chief of FDLE's Police Standards and Training Commission, regarding the proper classification under which the City should be registering UM officers with the state. Chief Rausch advised that UM officers should be registered with the state as "part-time" officers because "the policing of UM campus is by contract whereby the personnel are sworn, in title and authority only, as regular Coral

---

**3.** In support of their motions for summary judgment, the defendants have submitted thousands of pages of evidence, which include affidavits, deposition excerpts, employment-related documents, and the City–UM contracts. Additionally, the City has filed statements of undisputed facts pursuant to Southern District of Florida Local Rule 7.5. The plaintiffs dispute and/or supplement some of the allegations contained in the defendants statements with their own Local Rule 7.5 statements and with several exhibits. The

difficulty with the statements submitted by the plaintiffs is that they are comprised primarily of conclusory allegations that are unsupported by the record and/or record cites. Moreover, plaintiffs Allocco and Fernandez have submitted their own sworn statements to "fill in the blanks" or contradict the deposition testimony relied on by the defendants. In any event, the court has conducted an independent review of the exhibits filed by the plaintiffs, and any factual disputes between the parties are noted.

Gables police officers[,][t]hey derive no benefit as employees of the city and are strictly under the control of university management as a private institution." (Def.Ex. C). Section 943.10(6) defines a "part-time" law enforcement officer as "any person employed or appointed less than full time, as defined by an employing agency, with or without compensation, who is vested with authority to bear arms and make arrests and whose primary responsibility is the prevention and detection of crime or the enforcement of the penal, criminal, traffic, or highway laws of the state." [4]

On February 11, 1977, the City and UM modified their 1969 agreement to address Chief Rausch's concern. The modification stated, in pertinent part:

> "[T]he Chief of the Bureau of Standards, a state agency, interprets the state law that the police officers employed by the University for security purposes on the University campus must be classified as 'part-time police officers of the City'....
>
> [E]ven though the police officers on the University campus are engaged by the University, and paid by the University, and controlled by the University, it is nevertheless, the position of the Bureau of Standards that said police officers be processed for Police Standards and Training Commission registration purposes as part-time Coral Gables police officers....
>
> [I]f such police officers cannot be so processed, the University will be unable

to seek the placements to maintain its campus police officers....

> That the said agreement shall be modified notwithstanding any other provisions of the original agreement to the extent that the City will recognize the police officers of UM of Miami campus, for process by the Police Standards and Training Commission, as part-time Coral Gables police officers...."

(Def. Ex. 22, Modif. at 1). Since UM and the City entered into this modification, UM officers have continued to be registered with the FDLE as "part-time" City officers. It is undisputed that both the 1969 contract and the 1977 modification are public records. *See* Fla. Stat. § 119.01(1). For purposes of summary judgment, it also is undisputed that the UM–City contract was legal.[5]

### C. UM Officers are Classified as Part–Time City Officers

It is undisputed that, under the 1969 contract and the subsequent modification, UM officers are "regular" City officers. They differ, however, from other City officers in their classification as "part-time". For the plaintiffs, this difference is significant because, according to the plaintiffs, it creates a loophole through which the City can escape paying or conferring the same benefits upon UM officers as it is obliged to provide to regular officers who are classified as "full-time".

In addition to part-time status, other distinctions have arisen as a result of this

---

**4.** The CGPD Manual defines "full-time" and "part-time" employees, but it does not defines full-time or part-time officers. It defines a "full-time employee" as "[a]n employee who works 32 hours or more on a continuing basis (indefinite) and is eligible to receive all benefits and rights as provided by the Personnel

Rules and Regulations." "Part-time employees" are defined as "employees who work less than 32 hours a week on a regular basis."

**5.** This point was conceded by both parties during oral argument.

classification. For example, UM officers wore the same uniforms as City officers, but they also wore a patch or strip that designated them as "University of Miami". UM officers engage in community policing on the campus, interact daily with students, and speak at campus engagements. (Christensen Dec. at ¶ 7). At the same time, UM officers have police powers throughout the City and can carry out the duties of police officers, such as making arrests. (Christensen Dec. at ¶ 8). It is undisputed that UM officers received their police-related equipment from the UMPSD, not the City.[6] Additionally, the police cars driven by the UM officers were white, orange, and green and marked with "University of Miami", whereas the City's police cars were blue and white and marked with "City of Coral Gables".

UMPSD created the schedules for UM officers, and the schedules followed by City officers were not always the same. (Garcia–Montes Depo. at 65, 347; Allen Depo. at 111; Silva Depo. at 284). If UM officers were sick or needed to schedule a vacation day, they contacted UM, not the City. UM, not the City, maintained records of its officers' attendance and vacation entitlement. All of the plaintiffs' performance evaluations were done by UM on UM evaluation forms.

### D. FDLE's Review of the Part–Time Designation

On April 3, 1992, Larry Boemler, FDLE's Regional Field Specialist, became aware of the designation of UM officers as part-time City officers when the Coral Gables Police Department ("CGPD") registered Eric Shoemaker, the new Director of the CGPD, with the Criminal Justice Standards and Training Commission ("CJSTC"). Boemler found it "curious" that Shoemaker was registered with the City as a part-time officer because he worked full-time in law enforcement. In fact, all twenty-six of UM's officers were registered as part-time even though they worked forty or more hours per week. (Boemler Affid. at ¶ 4). Boemler requested "review by legal counsel to better define 'full-time', verify that salary incentives are not required, and endorse the arrangement between the University and the City." (Boemler Affid. at ¶ 4).

On May 8, 1992, FDLE's Assistant General Counsel, Joseph S. White, responded. He stated that private colleges and universities lacked the authority to establish a police agency. He added, "If [the individuals performing security functions for a university] happen to be duly employed law enforcement officers by a law enforcement agency whose jurisdiction includes the location of the private entity, they may then exercise police powers (arrests, criminal law enforcement, etc.). This is apparently the approach taken in this instance." (White Affid. at ¶ 7). White also opined that UM was not required to register the officers or to pay salary incentives. As to whether the officers appropriately were classified as "part-time", White stated:

> [Florida Statute] Section 943.10(6) allows the employing agency the discretion to determine which officers should be categorized as "part-time". Coral Gables Police Department has apparently done so in the case of these officers. For purposes of this analysis, I will assume that Coral Gables Police Department is aware that these part-time offi-

---

6. Only plaintiff Allocco received some of his equipment from the City, but UM paid for this equipment. (Allocco Depo. at 209–15; Clusman Depo. at 89).

cers work full-time for the University of Miami. Certainly, there is nothing in Chapter 943 which would prohibit a part-time officer from holding a full-time job with a private entity. I do not think this is altered by the fact that the private entity employment is in security. (White Affid. ¶¶ 6–7).

### E. Changes in the UM/City Relationship

From 1969 until early 1992, UM and the City operated fairly independently of each other. The Director of the UMPSD ensured that UM officers followed City directives and Standard Operating Procedures (CGSOPs). (Frechette Dec. at ¶¶ 3–6; Christensen Dec. at ¶ 6).

In late 1991, the CGPD began seeking accreditation through the Commission for Accreditation of Law Enforcement Agencies ("CALEA").[7] As the City reviewed its hiring processes to implement changes that would be necessary to meet CALEA's requirements, it began looking at UMPSD's hiring process, given that UMPSD officers were sworn in as part-time CGPD officers. (Werbin Dec. at ¶ 3). At the same time, CGPD became more involved in the recruitment and selection of its own officers, given that these functions previously were done by the City's Employee Relations Department. (Werbin Dec. at ¶ 3). Although it was unclear how the City's pursuit of accreditation would affect UM's operations, UM officials became concerned that the City might terminate the 1969 contract and take over policing the campus. (Lieberman Depo. at 42–52). As a result, in 1992, UM began

seeking legislation which, if passed, would have allowed it to become a fully independent police agency, much like campus police in the state system. These events created fear among the UM officers that their jobs were in jeopardy. (Lieberman Depo. at 20–21, 75–76; Clusman Dec. at ¶ 17).

Prior to 1992, the hiring process for the UM officers took place almost entirely through the UMPSD, with the exception of swearing in, which occurred at the CGPD. (Freschette Dec. at ¶¶ 2, 5). The UMPSD performed its own advertising, recruiting, investigating, and interviewing. (Freschette Dec. at ¶ 2; Pesa Depo. at 22–25; Clusman Dec. at ¶ 11). As the CGPD reviewed its hiring procedures and those of UMPSD, it established new procedures for persons it deemed qualified to be sworn in as City officers. These new procedures applied to both the City and UM applicants. (Werbin Dec. at ¶ 3). The only plaintiff affected by these procedures was Allocco because he was hired after 1992, whereas all the other plaintiffs were hired before this year.

The City's qualifications process was more thorough than UM's previous process. Because UM's background investigator, Bart Pesa, resigned at this time, UM and the City agreed that UM would pay CGPD Sergeant Marc Werbin overtime to process UM applicants. (Werbin Dec. at ¶ 5). During this time, Werbin also trained UM employees on the necessary steps in handing out and receiving completed application packages. (Werbin Dec. at ¶ 10).

Ultimately, the City's accreditation process ended successfully, and UM's legisla-

---

7. CALEA is a private, non-governmenal group of law enforcement officials who have set standards for the operations of a policing agency. There are approximately 480 standards that an agency must meet to become accredited, which is deemed to be a significant accomplishment among policing agencies. (Sours Depo. at 13–18).

tion failed. By September of 1995, UM and the City worked out an arrangement whereby UM directly employed Werbin during his off-duty hours to handle the background process, and all applicants were picking up application packages directly at UM. (Werbin Dec. at ¶ 10). Werbin continued in this position until 1997, when Richard Bannon, a retired City officer, contracted with UM to handle the background and screening function. (Bannon Depo. at 4–8; Werbin Dec. at ¶ 14). Since 1997, all UMPSD recruitment and selection functions have been handled through Bannon. (Werbin at ¶ 14).

### F. Supervision, Investigation, and Discipline

Henry Christensen is the Director of the UMPSD. He reports to Alan Fish, the Associate Vice President of UM's Financial Affairs Department. Christensen is responsible for the day-to-day operations of the UMPSD and is assisted in carrying out his responsibilities by Russell Clusman, Captain of the UMPSD, and William Gerlach, Lieutenant of the UMPSD. UMPSD hires, schedules, deploys, directs, evaluates, disciplines, and pays for training of its officers. (Christensen Dec. at ¶ 2; Clusman Dec. at ¶ 2; Gerlach Dec. at ¶ 2). At all times, UM officers are supervised on a day-to-day basis by UM employees. (Christensen Dec. at ¶ 5). Nevertheless, because UM officers are part-time City officers, the CGPD has the right under the 1969 contract to ensure that UM officers appropriately exercise their police powers. In this regard, UM officers are advised when they are sworn in that they are obligated to uphold the laws of Florida and the CGSOPs in the exercise of their police powers. (Clusman Dec. at ¶ 24). If UM or the City receives information that a UM officer has acted inappropriately in the exercise of his/her police powers, the situation can be investigated by the UMPSD or the City's IA process. In essence, the City has ultimate and overall authority on employment decisions involving UM officers, but it does not always choose to exercise this authority.

## II. The Facts as They Relate to Garcia–Montes [8]

### A. The Hiring Process

Garcia–Montes was employed by UM in the Accounts Payable Department from May of 1981 until August of 1982. While working for UM, Garcia–Montes became interested in applying for a police officer's position with UM. She went to UM, picked up a "University of Miami Application for Employment" form, filled it out, and returned it to UM. (Garcia–Montes Depo. at 18–21; Def. Ex. 102). Garcia–Montes never filled out an application for the City. (Garcia–Montes Depo. at 23). As far as Garcia–Montes could recall, all aspects of her hiring process were conducted through Sgt. Cokes Watson, who was employed by UM at the time. (Garcia–Montes Depo. at 25; Watson Dec. at ¶ 2).

Garcia–Montes does not recall the content of any discussions she had with anyone during the hiring or interview process, but Bart Pesa, who was a detective and background investigator with the UMPSD, recalls having specific discussions with Garcia–Montes during the background process comparing the pay, benefits, and

---

8. The plaintiffs have not disputed any of the facts submitted by the defendants as they re-

late to Garcia–Montes.

rights of the UM officers to the City officers. (Pesa Depo. at 26–31). Specifically, Pesa told Garcia–Montes how much she would be paid and related the facts that UM paid its officers less than the City paid its officers, that the UM officers did not receive the state educational incentive money (as opposed to the City, which did), that UM's retirement plan was not comparable to the retirement plan of the City, and that UM officers were classified as part-time. (Pesa Depo. at 26–28). Garcia–Montes has not provided any evidence to refute this testimony.

Garcia–Montes was hired on April 5, 1985, and she remains employed with UMPSD today. From the beginning of her employment, Garcia–Montes was aware that she received her police powers from the City and that UM and the City had a contractual arrangement regarding police officers. (Garcia–Montes Depo. at 269, 270, 275). Garcia–Montes testified that, although no one ever told her she was employed by the City, she felt she had dual employers. (Garcia–Montes Depo. at 38, 277).

Upon her hiring, UM paid for Garcia–Montes to attend the police academy. Garcia–Montes signed a Cost of Training Agreement in which she promised to repay UM for tuition it expended for her to attend the academy if she did not remain employed with UM for at least two years. (Garcia–Montes Depo. at 33–34, Def. Ex. 106). In this agreement, Garcia–Montes was designated as "Employee" and UM was designated as the "Employer". (Def.Ex. 106).

## B. Garcia–Montes' Knowledge of Differences Between UM and City Officers

Garcia–Montes has known throughout her employment that she was employed both by UM and the City. (Garcia–Montes Depo. at 269, 277–79). She also knew that the City officers were employed exclusively by the City. (Garcia–Montes Depo. at 316–17). Garcia–Montes acknowledges that, as a UMPSD officer, she was required to abide by UM's policies, rules, regulations, and SOPs, as well as the City's SOPs. She also understood that she was an at-will employee that could be terminated for violation of UM's policies.

Although several UM officers have testified that it was common knowledge that the City paid its officers better and provided more benefits, Garcia–Montes claims that she did not know about the disparity at the beginning of her employment, but she admits that she learned of it around 1990 when she heard former UMPSD Officer Dennis Whitt discussing it with another UM officer. (Garcia–Montes Depo. at 192; Clusman Decl. at ¶ 8). In early 1993, Garcia–Montes knew that several UM officers left the department because of the disparities in pay and benefits. She recalls that Manny Montalvo, Rita Shove, and Cathy McElhaney all left at about the same time for this reason. (Garcia–Montes Depo. at 182–83; McElhaney Depo. at 19).

Garcia–Montes also recalls receiving a memorandum dated May 6, 1993, which contained a comparison of the pay and benefits between the City and UM police departments. (Garcia–Montes Depo. at 185–86, Ex. 23). She was present in a meeting at about the same time in which the UM officers discussed with UM Vice President Dave Lieberman the fact that the City police had better benefits and retirement than UM police. Garcia–Montes admits that the disparities between UM and City police were a significant issue at this meeting and continued to

be a significant topic of ongoing discussion for some time. (Garcia–Montes Depo. at 181).

Garcia–Montes testified that, in 1995, she received a memorandum from UM Vice President Alan Fish, who offered to meet with UM officers individually or in groups to discuss their concerns. Garcia–Montes opted to do so and recalls discussing the pay and benefits disparities with Fish. (Garcia–Montes Depo. at 204, Ex. 32). She also recalls receiving a memorandum from Eric Shoemaker in March of 1995 regarding salary and supplemental retirement, in which Shoemaker stated, "[W]e are showing this commitment to the department in a desire to keep you all with the university." (Garcia–Montes Depo. at 200, Ex. 31).

Beginning in 1986, Garcia–Montes completed IRS W–4 forms reflecting that UM was her employer. (Garcia–Montes Depo. at 42–43, 46, 47; Def. Ex. 107, 108). Throughout her employment, Garcia–Montes has recorded her work hours on UM time sheets and has received all of her compensation and benefits, including insurance, holidays, and vacations, from UM. (Garcia–Montes Depo. at 94,95, 47, 47, 58, 138–39). Garcia–Montes was aware that, in the event of a shooting or similar occurrence, UM, and not the City, would provide her with legal representation. (Garcia–Montes Depo. at 104). Garcia–Montes never received any compensation or benefits from the City. (Garcia–Montes Depo. at 97, 145).

By 1991, Garcia–Montes had become aware that UM officers were limited to off-duty details on UM campuses only, whereas City officers could work off-duty details anywhere throughout the City. (Garcia–Montes Depo. at 164). This disparity in off-duty details was a source of discussion and disagreement among the UMPSD officers. (Garcia–Montes Depo. at 164–65).

## C. Garcia–Montes' Knowledge of Part–Time Status Designation

Garcia–Montes admits that the UMPSD Policies and Procedures Manual was made available to her, at least as early as 1985, when UMPSD Field Training Officer Hudak reviewed it with her. Pages twenty-seven and fifty-nine of the manual state that the part-time status limits UMPSD officers in making off-duty arrests or carrying weapons off-duty. Former UMPSD Detective Bart Pesa testified that he instructed Garcia–Montes during the hiring process that UM officers could not carry guns off-duty because of their part-time status. (Pesa Depo. at 29–30).

Garcia–Montes further admits that she had an obligation to review the CGSOPs that were issued to her. She admits that she reviewed the May 3, 1989, revision to CGSOP 28 at the time it was issued. This SOP states that UM officers are designated as part-time Coral Gables officers. (Garcia–Montes Depo. at 284–86, 289–90, Ex. 17). Although she worked forty or more hours per week, Garcia–Montes never inquired as to why she was considered to be a part-time city officer.

In the late 1980s, Garcia Montes was required to review her official file, which was maintained at the City. In this file, she saw a document entitled "Criminal Justice Standards and Training Commission Registration Form". This document reflected that she was classified for FDLE purposes as a part-time officer with the City. Again, Garcia–Montes never asked anyone about this classification. (Garcia–Montes Depo. at 292, 296, Ex. 254).

In approximately 1990, when Garcia–Montes heard Dennis Whitt discussing the

contract between UM and the City with her coworker, she heard him mention the fact that the UM officers were designated as part-time. (Garcia–Montes Depo. at 192). Finally, Garcia–Montes admits that, in late 1991, she received a memorandum from UMPSD Director Eric Shoemaker, which stated, in relevant part:

> During the past day or so, rumors have been repeated in reference to what will be going to happen to our department and possibly our jobs. There are two issues at hand here. The first deals with the impact of the Coral Gables Police accreditation process; the second is how the University is dealing with the contingencies. Simply put, the accreditation process pursued by the Coral Gables Police *brings our status as "part-time Police" into question.* There are several opinions as to what must be done with us in order that the Coral Gables Police achieve accreditation. It is my sense that this is not clear to anyone involved.

(Garcia–Montes Depo. at 188–89, Ex. 88) (emphasis added).

### D. Evidence Related to Conspiracy and RICO Claims

Garcia–Montes admits that she has no knowledge as to whether the City had anything to do with determining how much UM would pay its officers, what benefits they would have, or "what agreement was between them". (Garcia–Montes Depo. at 251). She has no evidence that the City participated or assisted in writing UM's policies or procedures, or that they engaged in a scam to profit in a plan that defrauded job applicants. Garcia–Montes lacks evidence that UM and the City met to discuss the UM officers' part-time status. Finally, Garcia–Montes is not aware of any fraudulent actions or statements specifically directed at her by way of mail or phone that would support her RICO claim. (Garcia–Montes Depo. at 457–59).

### III. The Facts as They Relate to Allen [9]

#### A. The Hiring Process

In 1980, Allen was working as a process server with Court Services. While serving a subpoena at UM, he learned that there was an opening for a police officer, and he picked up an application. The application said "University of Miami" at the top of the page. Allen completed the application and returned it to UM, but he did not fill out an application for the City. (Allen Depo. at 51–57). Before and after submitting the application, Allen had discussions with UMPSD Detective Juan Seabolt, whom Allen knew from when Seabolt and Allen worked together for the City of South Miami. Seabolt conducted Allen's background investigation.

Allen believes he had two interviews, both of which occurred on UM's campus. One interview was with UMPSD Chief Curt Ivy, someone from UM Human Resources, and someone from the City. Allen cannot recall the name of the individual from the City, whom he says "sat in" on the interview. (Allen Depo. at 62–64). The other interview was conducted by UMPSD Chief Ivy and UMPSD Detective Seabolt. (Allen Depo. at 64). The only thing that Allen can recall from this interview was that Ivy made a comment to the effect that the starting pay and benefits of

---

9. The plaintiffs have not disputed any of the facts asserted by the defendants as they relate to Allen.

UM were "in parity" with what the City provided for its officers. (Allen Depo. at 65–67, 178, 186). Ivy never explained what he meant by the term "parity", but Allen admits that Ivy's comment regarding parity referred only to the starting pay and benefits. (Allen Depo. at 309–10). No representation was made that UM would, over time, maintain parity with the City. (Allen Depo. at 307–08). Allen admits that Ivy did not discuss any specific benefits, such as insurance, retirement, off-duty assignments, transfer abilities, or advancement possibilities. (Allen Depo. at 69, 186, 310–11).

While Allen has stated that he had discussions with Seabolt about pay and benefits of being a UM officer, he cannot recall the specifics about the conversations. (Allen Depo. at 150–51). Seabolt, on the other hand, recalls that he told Allen that UM paid its officers less than what the City paid and that the retirement and other benefits differed. (Seabolt Depo. at 13, 27). Seabolt testified that he would not have hidden this fact from Allen because the differences were "blatantly obvious". (Seabolt Depo. at 25, 33). Allen does not deny that Seabolt told him these things.

After Allen accepted a position with UM, he submitted a resignation letter to Court Services, advising that he had accepted a position of police officer with UM. (Allen Depo. at 74, Ex. 61). He was then taken to the CGPD and sworn in by either Chief Bush or Chief Skalaski. (Allen Depo. at 72). After the swearing in, the CGPD Chief that swore him in commented that Allen would have to stay at UM for at least one year before he could "transfer over". (Allen Depo. at 102). Allen was aware that UMPSD officers that left to work for the City had to go through an entirely new hiring process to become employed by the City. (Allen Depo. at 163).

Upon being hired by UM, Allen attended an orientation at UM in which UM representatives discussed benefits and UM policies and procedures. (Allen Depo. at 80–81). Employees from other UM departments attended the orientation.

## B. Allen's Knowledge of Differences Between UM and City Officers

Allen contends that, throughout his employment, he knew that he was employed by both UM and the City. (Allen Depo. at 73, 237–38). He was aware that he received all of his pay and benefits, including vacations, holidays, retirement, and tuition remission, from UM. He also knew that all workers' compensation injuries were to be reported to UM, not the City. (Allen Depo. at 122, 351, 354–57, 362–65, 374, Ex. 39, 194–98, 207). Allen has not received any compensation or benefits from the City. (Allen Depo. at 123, 374, 384).

Allen was aware that, as a UMPSD officer, he was required to abide by UM's policies, rules, and regulations. (Allen Depo. at 57, 81–82, 11, Ex. 60). He received copies of UM's employee's handbooks and Drug Free Workplace Policy, and copies of UM's Policies and Procedures and SOPs always were available to him. (Allen Depo. at 81, 83–85, 89–92, 94, 128, 216–18, Ex. 68–74, 90–92). Allen knew that he was an at-will employee who could be terminated for violation of UM's policies. He also understood that he was obliged to abide by the CGSOPs, and he received a full set of the CGSOPs in 1992. Allen knew that he could be disciplined by UM. In fact, he was disciplined by UM on several occasions for attendance and performance issues. (Allen Depo. at 227–28, 400–13, Ex. 97, 209–22). In 1981, Allen utilized UM's grievance process relating to UM-imposed discipline. (Allen Depo. at 140–41, Ex. 81).

Allen was aware that UM officers received certain benefits on campus to which City officers were not entitled. For example, UM officers could receive complimentary meals at UM dining facilities and use the library and swimming pool. Allen also was aware that UM officers were limited to off-duty details only on UM campuses, whereas City officers could work off-duty details anywhere throughout the City. (Allen Depo. at 204, Ex. 89). Allen admitted to knowing that, in the event of a shooting or similar occurrence, UM, and not the City, would provide him with legal representation. Additionally, in 1989, Allen became aware that UM officers were indemnified by UM for civil and criminal actions resulting from the performance of their duties. (Allen Depo. at 348, Ex. 193).

Although Seabolt testified that he informed Allen, during the hiring process, about the difference in pay and benefits between UM and City officers, Allen claims that he did not have a full understanding of these differences until August of 1992, when City officers began supplementing UM's police force after Hurricane Andrew. At that time, City officers told Allen how much they were making per hour. (Allen Depo. at 79–80). Despite Allen's statement that he did not appreciate the differences until 1992, former UMPSD Detective Bart Pesa testified that, in 1984, Allen explained these differences to him during a conversation at UM's Rathskeller. During this conversation, Allen told Pesa that UM officers were paid less than Gables officers, did not have the same benefits, did not receive the same state educational incentive money, and did not participate in the same pension plans. (Pesa Depo. at 7–10). Allen also told Pesa that, because UM officers were classified as part-time City officers, they could not carry their guns off duty. (Pesa Depo. at 11–12).

In early 1993, Allen became aware that several UM officers left the department because of the disparities in pay and benefits, and the uncertainty and instability of the department. These officers left to work for the Village of Key Biscayne. (Allen Depo. at 172; Montalvo Depo. at 37–38). Additionally, Allen knew that several officers left UM in the mid–1980s to work for the City and each had to submit a City application and complete the City's background hiring process. (Allen Depo. at 163).

Allen also recalls that in May of 1993, there was a meeting with "[p]ractically the entirety of the department" in which UM Vice President David Lieberman discussed the differences in pay and benefits between UM and the City. (Allen Depo. at 186–89, Ex. 23, 24). Allen believes that a written comparison study was distributed and discussed at the meeting. (Allen Depo. at 189, Ex. 23). The study compared such things as holidays, vacations, sick leave, workers' compensation, tuition remission, and the grievance procedures of UM and the City. (Allen Depo. at 193). Allen describes the meeting as "pretty vocal". (Allen Depo. at 193). He stated that UMPSD Sergeant Smith's letter of June 10, 1993, correctly outlined the issues discussed at the meeting, including parity with the City, pay classifications, state salary, incentives, and a better retirement plan. (Allen Depo. at 193–96, Ex. 19).

## C. Allen's Knowledge of UM's Part-Time Status Designation

Former UMPSD Detective Juan Seabolt specifically recalls discussing the part-time classification of UM officers with Allen. (Sealbolt Depo. at 22–23). Additionally, as mentioned in the preceding section, former UMPSD Detective Bart Pesa testified that

Allen explained to him, in 1984, that, because UM officers were classified as part-time City officers, they could not carry their guns off-duty. (Pesa Depo. at 12). While Allen admits that he often heard comments about "part-time" classification, he states he did not pay attention to these comments.

Allen admits that he knew he had an obligation to review the CGSOPs, which were periodically updated. He admits that the CGSOP dated July 10, 1986, reflects that UM officers were classified as part-time City officers and that he had an obligation to review this document at the time it was issued. (Allen Depo. at 155–56, Ex. 86).

In 1992, the UMPSD was in turmoil regarding changes that were occurring in the City. Allen admits that the issues discussed at the time were consistent with the memorandum issued by Eric Shoemaker to "All Police Officers", on October 30, 1992, which stated that the City's accreditation process would bring the UM officers' status as " 'part-time Police' into question." (Allen Depo. at 159, Ex. 88).

Several UM officers recall former UMPSD Officer Dennis Whitt frequently discussing the part-time classifications in the late 1980s. He had copies of the 1969 UM–City contract and the 1977 modification, and he often spoke out about how the officers were classified as part-time. Whitt said he would sue to break the contract so that the UM officers could be treated like City officers. (Pesa Depo. at 40–42; Garcia–Montes at 192; Smith Depo. at 95–101, Watson Decl. at ¶ 1; Hudak Decl. at ¶ 6). Whitt posted the contract at the UMPSD bulletin board, circu-

lated it, and placed it on the squad room table. (Pesa Depo. at 40–42, 62; Smith Depo. at 95–101; Hudak Decl. at ¶ 6). Allen admits to having several discussions with Whitt about the 1969 contract some time in the late 1980s, but he does not recall the specifics of these conversations. Allen does admit, however, that he reviewed the contract in 1992 and saw that it referred to UM officers as part-time City officers. (Allen Depo. at 236).

## D. Evidence Related to Conspiracy and RICO Claims

Allen admits that he has no knowledge as to whether the City had anything to do with determining how much UM would pay its officers, what benefits they would have, or "what agreement was between them". (Allen Depo. at 256). He also has no evidence that the City participated or assisted in writing UM's policies or procedures, or that they engaged in a scam to profit in a plan that defrauded job applicants. Allen has no evidence that UM and the City met to discuss the UM officers' part-time status.

Finally, Allen is not aware of any fraudulent actions or statements specifically directed at him by way of mail or phone which would support his RICO claim. The only alleged false statement that Allen contends was communicated to him was by UMPSD Chief Ivy when he told him that UM and City pay was "in parity", but this communication was made to Allen by Ivy in person (Allen Depo. at 169, 178–86). Allen does not have any evidence that the City was aware or agreed with what Ivy told Allen about pay and benefits. (Allen Depo. at 209, 256).

## IV. The Facts as They Relate to Silva[10]

### A. The Hiring Process

Sometime in 1987, Silva saw an advertisement in the Miami Herald for a police officer position with UM. (Silva Depo. at 82). Silva traveled to UM, picked up an application, and returned it to UM on August 18, 1987. (Silva Depo. at 82, Ex. 254). At the time of his application and throughout his background investigation process, Silva believed he was applying to be a UM police officer. (Silva Depo. at 102).

Silva interviewed for his position with UMPSD with UMPSD Director Curt Ivy on the UM campus. (Silva Depo. at 242). The only thing that Silva recalls about the interview was that he and Ivy discussed the fact that UM was looking for the type of officer that would interact well with students. Silva does not recall any discussion about pay or benefits, nor a comparison being made between UM's and the City's pay and benefits for officers. (Silva Depo. at 243).

Silva did not interview with anyone at the City. (Silva Depo. at 244). In fact, he did not know that there was a contract between UM and the City until he was taken to the CGPD to be sworn in. (Silva Depo. at 102). At that time, CGPD Chief Skalaski told Silva he was being sworn in as a City officer. (Silva Depo. at 102). Chief Skalaski did not tell Silva that he was an employee of the City, nor that UM officers had the ability to transfer laterally to the CGPD. (Silva Depo. at 247, 304–05).

Silva did not attend an orientation at the City, but he did attend an orientation at UM. During this orientation, there was a discussion of the benefits that he would receive from UM, and Silva did in fact receive these benefits. (Silva Depo. at 2).

### B. Silva's Knowledge of Differences Between UM and City Officers

Silva always knew that he was employed by UM, that he received all of his pay and benefits from UM, and that he received his police powers from the City. This is reflected in the fact that Silva's IRS W–4 and W–2 forms indicate that UM was Silva's employer. (Silva Depo. at 306, Ex. 285, 286). Silva also knew that the officers working for the City were not employed by UM and that they received all of their pay and benefits from the City. (Silva Depo. at 59–61, 94–96).

Silva recognized that, from the beginning of his employment, he had to abide by UM's policies, rules, and regulations, including those set forth in employee handbooks and in the UM Drug Free Workplace Policy. Silva knew he could be disciplined by UM, and, in 1990, he was written up for insubordination. (Silva Depo. at 255–58, 262–63, Ex. 274, 275). He submitted a grievance through UM, not the City, for this write up. (Silva Depo, Ex. 261–64, 266). Silva understood that he had an obligation to abide by the CGSOPs, but City officers did not receive UM employee handbooks. Silva explained, "We were getting—the Division of the University of Miami were getting those books because we were getting the pay and the benefits from UM. That is why the downtown officers weren't getting it." (Silva Depo. at 257–58).

According to Silva, his background investigation was conducted by UMPSD De-

---

10. The plaintiffs have not disputed any of the facts submitted by the defendants as they relate to Silva.

tective Bart Pesa. Although Silva does not remember what he discussed with Pesa, Pesa has testified that, like with all new applications, he explained to Silva the situation at the UMPSD regarding pay, benefits, and the part-time classification. (Pesa Depo. at 35). Pesa recalls that, because Silva had worked for the Broward County Sheriff's Office, he knew more than other applicants and asked very particular questions, such as the availability of state benefits, retirement, overtime, and rotating shifts. (Pesa Depo. at 23, 35–38). Pesa also recalls specifically discussing the part-time classification in connection with the fact that UM officers could not carry their guns off duty. (Pesa Depo. at 35, 38–39).

Silva contends that he did not become aware of the differences between UM and City officers until 1991 or 1992, when the City began to go through the accreditation process. (Silva Depo. at 147–48). The record shows that, by 1991, Silva knew that UM officers were limited to off-duty details only on the UM campus or UM-sponsored events, whereas City officers could work off-duty details anywhere throughout the City. (Silva Depo. at 381–83). In February of 1992, Silva requested that UM change the manner in which shifts were assigned so that UM officers could bid by seniority on shifts like the City officers. (Silva Depo. at 284–85). Silva also was aware that, in early March of 1993, UM President Foote held a meeting to address the UM officers' concerns about the differences between UM and City officers. (Silva Depo. at 320). Silva admits that he attended this meeting. Former UM officer Gene Gibbons confirms this, as he has testified that he saw Silva standing up and pointing to President Foote at the meeting. (Gibbons Depo. at 58–61).

On four separate occasions, Silva applied to work for the City, but his application was rejected each time. According to Silva, he wanted to transfer to the City because of the better pay and benefits. (Silva Depo. at 461). Silva admits that he was not told he could transfer laterally from UM to the City, but that he had to go through an independent application process. (Silva Depo. at 304–05). Silva recognizes that other UMPSD officers who successfully became City officers were required to submit new applications to the City and go through the entire background process. (Silva Depo. at 91–92, 153–55).

### C. Silva's Knowledge of Part–Time Status Designation

Silva admits that, throughout his employment, UM officers were referred to as "part-timers", but he never asked anyone what this classification meant. (Silva Depo. at 219, 220). Silva also recognizes that the UMPSD Policies and Procedures Manual was made available to him a couple of years after he began working for UM. This manual specifically discusses the limitation of UMPSD officers in making off-duty arrests or carrying weapons off-duty because of their part-time status. (Silva Depo. at 104–05, Ex. 80). As mentioned in the preceding section, former UMPSD Detective Bart Pesa instructed Silva that he could not carry a gun off-duty because of his part-time status. (Pesa Depo. at 35, 38–39).

Silva admits that he received CGSOP 28 on May 3, 1989, the date the revision was issued. This SOP states that UM officers are designated as "part-time" Coral Gables officers. (Silva Depo. at 372, Ex. 17). Silva also referred to CGSOP 28 in a December 1990 memorandum that he wrote to UMPSD Lieutenant Clusman to terminate a grievance he was processing through UM. (Silva Depo. at 203, Ex. 266).

On October 30, 1992, UMPSD Director Eric Shoemaker issued a memorandum to all UMPSD officers. This memorandum stated, in pertinent part, that the accreditation process being pursued by the City brought their status as " 'part-time Police' into question". (Silva Depo. at 222–23). Although Silva does not remember reading this memorandum, he states that the discussions at the time amongst his coworkers were consistent with Shoemaker's memorandum. (Silva Depo. at 223, 229–30).

Silva also admits that the part-time classification came to his attention in either 1992, 1993, or 1994, when he submitted his application to the City of Charlotte. The City contacted him and advised him that FDLE informed it that Silva was classified as part-time through the City. (Silva Depo. at 160–62). Silva's application for the City of Charlotte was signed in August of 1992.

### D. Evidence Related to Conspiracy and RICO Claims

Silva admits that he has no knowledge as to whether the City had anything to do with determining how much UM would pay its officers or what benefits they would have. (Silva Depo. at 522). He also has no evidence that the City participated or assisted in writing UM's policies or procedures, nor that they engaged in a scheme to profit in a plan that defrauded job applicants. Silva has not submitted any evidence that he may have obtained from the City or UM through the wires or mail.

## V. The Facts as They Relate to Allocco

### A. The Hiring Process

Allocco worked in UM's law library as a student in the work/study program from January 1991 until December 1992. In early 1993, Allocco responded to an advertisement in the *Miami Herald* for a police officer position. (Allocco Depo. at 43). The advertisement said "Police Officer University of Miami", but it told applicants to apply in person at the CGPD. (Allocco Depo. at 43, 106–07). Allocco went to the CGPD and picked up an application packet from CGPD Sergeant Marc Werbin. (Allocco Depo. at 44). Allocco is the only plaintiff who applied to be UMPSD officer at the City.

Although Allocco contends that he applied to be an employee and full-time police officer for CGPD, the videotape of his August 12, 1993 pre-polygraph interview shows otherwise. In this interview, CGPD Detective Whitley asks Allocco if he applied to any other policing agencies. Allocco answers "no", then adds, "I would have applied to Coral Gables, but Richard [Reynolds] and I only found out about it at like two days after the deadline for putting in the application." (Allocco Depo. at 60, 297, Ex. 406). Additionally, on July 12, 1993, Allocco wrote to Sergeant Werbin, referencing "my application for University of Miami police officer." (Allocco Depo. at 116–17, Ex. 243).

Allocco testified that, during his background investigation, which was conducted by Werbin and CGPD Officer Herbst, Werbin explained that UM wanted more police officers than the City was willing to provide for budgetary reasons. In order to place more officers on campus, UM and the City entered into a contract whereby UM agreed to pay for the officers. (Allocco Depo. at 52–53; Werbin Decl. at ¶ 11).

Allocco was present when Werbin interviewed his mother and father during his background investigation. During this interview, Werbin mentioned to Allocco's father that Allocco would be a City police

officer assigned to UM. (Allocco Depo. at 50). Allocco then attended an oral interview with several individuals from UM and the City. Following these interviews, Allocco was given a conditional offer of employment, which was written on UM letterhead. This later stated, in pertinent part:

> Further, we reiterate that this conditional offer of employment is for the position of police officer with the University of Miami. Although the application/interview/selection process, post conditional offer process and swearing-in is primarily conducted by the City of Coral Gables Police Department, *you are not being offered employment with the City of Coral Gables or its Police Department.* As such, this conditional offer of employment does not create any express or implied contractual rights to any policy, procedures or benefits of the City of Coral Gables or the City of Coral Gables Police Department.

(Allocco Depo. at 122–25, Ex. 246) (emphasis in original). Allocco signed an acknowledgment on page two of this conditional offer below a paragraph stating, "I acknowledge that I have received and read a copy of this conditional offer of employment for the position of police officer with the University of Miami." (Ex. 246). Allocco then proceeded with the final steps of the hiring process, including the polygraph mentioned above.

Allocco's official hire date was August 30, 1993. On that date, he completed a University of Miami Application for Employment. (Allocco Depo. at 118–20, Ex. 245). This form confirmed Allocco's at-will employment status by stating that "both I and the University have the right to terminate my employment at any time." (Ex. 245). Following Allocco's graduation from the police academy, he signed an Oath of Office, which stated that he was sworn as a "Regular Police Officer—University of Miami ... sworn-in for the University of Miami (part-time)". (Allocco Depo. at 132–35, Ex. 247).

## B. Allocco's Knowledge of Differences Between UM and City Officers

Allocco knew that he received all of his pay and benefits from UM, and not the City. In fact, he received his W–2 Forms from UM, which listed him as an "employee". (Allocco Depo. at 156, Ex. 385). When he was hired, Allocco swore to obey the City's and UM's rules and regulations. He received UM employee handbooks and acknowledged his obligation to become familiar with and abide by UM's policies and rules, including UM's Drug Free Workplace Policy. (Allocco Depo. at 140–42). Allocco received and read the full set of the CGSOPs immediately after he was sworn in in March of 1994, but he also received UMSOPs that pertained to UM policing issues not covered by the CGSOPs. (Allocco Depo. at 71, 94).

In November of 1995, the President of the FOP Lodge 7, the union that represented full-time City officers, advised UM officers that they could not join the regular union because of their part-time classification. (Allocco Depo. at 514, Ex. 347). Rather, UM officers were eligible to join the associate lodge, FOPA, and obtain legal representation through their labor counsel. UMPSD officers Allocco, Silva, Montalvo, and Esteves joined the FOPA, and Allocco received legal assistance through the Labor Council in March of 1996. (Allocco Depo. at 517–19).

In addition to the differences in pay and benefits experienced by UM and City offi-

cers, differences existed in the type of equipment used by each department. In the Fall of 1995, Allocco and several other officers met with UM administrators, including UM President Foote, to complain that they did not have the same type of equipment as other City officers. (Allocco Depo. at 446–49, Ex. 353). On October 2, 1996, Allocco drafted a petition outlining the discrepancies in equipment, which was signed by eight UM officers. The petition stated, "As anyone can see, there are very large discrepancies between Coral Gables UM patrol officers and regular Coral Gables officers." (Allocco Depo. at 446–48, Ex. 353).

On July 1, 1998, Allocco attempted to apply for the City sergeant's examination, but he was told that he was ineligible to do so because he was not employed by the City. (Allocco Depo. at 92–96, Ex. 417; Sours Depo. at 151). Allocco never inquired as to the promotion procedure for UMPSD officers. (Allocco Depo. at 98–99).

### C. Allocco's Knowledge of Part–Time Designation

Allocco claims that he was unaware of his part-time classification until 1996 or 1997, when he spoke to FDLE about the issue (Allocco Depo. at 83), but the part-time classification was clearly stated in the oath, which is quoted above, that Allocco signed in March of 1994. (Allocco Depo. at 132–35, Ex. 247). Additionally, CGSOP 28, which Allocco admits to reading when he was sworn; the 1996 revision to CGSOP 28; and an Internal Affairs ("IA") report read by Allocco in 1996, all refer to Allocco's part-time status. (Allocco Depo. at 71, 94, 248, 255, Ex. 17, 150). The IA report stated that UM officers "are sworn part-time police officers, who derive their authority from the City of Coral Gables Police Department." (Allocco Depo. at 267–70). Moreover, former UMPSD Officer Michael Alicia, who worked with Allocco from 1994 until 1996, recalls Allocco complaining about the part-time classification. (Alicia Decl. at ¶ 4).

### D. Evidence Relating to RICO Claims

Allocco admits that, to the extent he received the documents that allegedly support his RICO claim, they would have been handed to him, placed in his box, or posted on the bulletin board. (Allocco Depo. at 476–96). Additionally communications to him by UM or the City were made either in person or placed in his UM mail slot. (Allocco Depo. at 469–71). Allocco recalled receiving updates of his application process by mail and one of his IA notices by facsimile. (Allocco Depo. at 469–71).

## VI. The Facts as They Relate to Fernandez

### A. The Hiring Process

Fernandez worked for UM on two separate occasions. The first time, in 1982, Fernandez responded to an advertisement for a police officer position with UM, and he was hired following his completion of a UM application and the investigation process. Fernandez resigned in 1985, submitting a UM resignation form. (Fernandez Depo. at 165). Fernandez returned to UM in 1988. Like the first time, Fernandez completed a UM application, where he listed UM, not the City, as his prior employer. (Fernandez Depo. at 130–31, Ex. 166).

### B. Fernandez's Knowledge of Differences Between UM and City Officers

Fernandez knew that he received all of his pay and befits from UM. This is evi-

denced by his W–2 forms, which he received from UM. (Fernandez Depo. at 121, 208, Ex. 223). When he was hired, Fernandez swore to obey the City's and UM's rules and regulations. He received UM employee handbooks and acknowledged his obligation to become familiar with and abide by UM's policies and rules, including UM's Drug Free Workplace Policy. (Fernandez Depo. at 142, 151, 784, 796, Ex. 169, 175, 459, 461). Fernandez received the full set of the CGSOPs in February of 1992, but he also received UMSOPs that pertained to UM policing issues not covered by the CGSOPs. (Fernandez Depo. at 136–41).

In 1990, Fernandez applied for a UMPSD sergeant's promotion. He went through the process with other UMPSD officers, such as Gerlach. The process included the completion of a written examination for which Fernandez was given all the written materials to study. (Fernandez Depo. at 372–78). These written materials included the UMPSD Policies and Procedures Manual, UMSOPs, and a complete set of CGSOPs. (Gerlach Decl. at ¶ 9, Ex. 80). As a result of their successful completion of this process, Fernandez and Gerlach were promoted. (Christensen Decl. at ¶ 14).

By 1991, Fernandez knew that UM officers could only do off-duty details on the UM campus (or UM related events), whereas City officers could do them throughout the City. Fernandez thought that this policy was unfair. (Fernandez Depo. at 304–09, Ex. 89). By 1992, Fernandez knew that he could not join the FOP, the union that represented the City's full-time officers, because he was a UM employee. (Fernandez Depo. at 311–13, Ex. 234).

Former UMPSD Detective Bart Pesa worked and was friends with Fernandez both times Fernandez worked for UM. Pesa recalls that he and Fernandez often discussed the differences in pay and benefits between UM and City officers. (Pesa Depo. at 32–33). They also discussed the differences in pension plans between the CGPD and UMPSD. (Pesa Depo. at 33–34). Additionally, Pesa recalls having conversations with Fernandez about their inability to transfer to the CGPD. (Pesa Depo. at 38). All of these conversations occurred, at the latest, in 1992 because Pesa left UM in January of 1993. (Pesa Depo. at 5).

In early 1993, several UM officers left the UMPSD because of disparities in pay and benefits. In May of 1993, UM Vice President Liebermen held a meeting, during which the differences in pay and benefits between UM and the City were discussed. (Allen Depo. at 186–89, Ex. 23, 24; Garcia–Montes Depo. at 181–86; Silva Depo. at 320). According to plaintiff Allen, a comparison study outlining differences between the City and UM with respect to holidays, vacations, sick leave, and other matters was distributed. (Def.Ex. 23). UMPSD Clusman recalls that Fernandez attended the meeting because he looked at Fernandez with embarrassment when Silva became emotional about some of the issues being discussed. (Clusman Decl. at ¶ 21). Fernandez does not deny being at the meeting. (Fernandez Depo. at 423–33).

## C. Fernandez's Knowledge of Part–Time Designation

Fernandez received a copy of the UMPSD Policies and Procedures Manual in connection with his application for the sergeant's position in June of 1990. (Fernandez Depo. at 378; Gerlach Decl. at ¶ 9, Ex. 80). He also acknowledged reviewing

this document in June of 1990 when he was Todd Bleak's Field Training Officer. (Fernandez Depo. at 727–34). These points are significant because the manual discusses that the part-time status limits UMPSD officers in making off-duty arrests and in carrying weapons off-duty.

Fernandez received a full set of CGSOPs on February 24, 1992. Fernandez stated, "If it was issued and I signed for it, then I read it." (Fernandez Depo. at 260). Again, this point is significant because CGSOP 28 classifies UM officers as "part-time" Coral Gables officers. (Def.Ex. 17).

### D. Evidence Relating to RICO Claims

Fernandez admits that, to the extent he may have received any of the documents that allegedly support his RICO claim, those documents were placed in his UM box or handed to him. (Fernandez Depo. at 532). The only exception to this is the 97/98 Safety and Security Brochure, which Fernandez "thinks" that UM mailed to him, but he is not sure. (Fernandez Depo. at 564).

### VII. Facts Relating to Allocco's and Fernandez's Additional Claims [11]

#### A. Allocco's and Fernandez's Employment

#### 1. Sexual Harassment Complaint Against Fernandez

In 1994, Garcia–Montes filed a complaint of sexual harassment against Fernandez. UMPSD Director Shoemaker requested that the City's IA Unit conduct the investi-

gation because of the sensitivity of the issue and the fact that two UM police sergeants were involved. (Def.Ex. 333, 334). On January 30, 1995, Fernandez told UMPSD Lieutenant Clusman that the complaint was an internal UM problem that should have been handled exclusively by UM. (Clusman Decl. at ¶ 31, Ex. 340). Fernandez initially refused to participate in the IA process, but he then requested representation, which UM provided. Fernandez eventually hired his own attorney.

### 2. UM's Housing of Documents

On October 30, 1996, Fernandez went to UM's Human Resources Department to investigate rumors that UM's personnel office was housing confidential documents. According to Fernandez, he "was discovering all the illegal and law violations that the university were doing with the help of the Gables as far as running this whole illegal operation reporting to have their own private police department and at that time the Gables was forwarding confidential police investigation documents to the university which is a total violation of the law." (Fernandez Depo. at 162–63). At the Human Resources Department, Fernandez saw a document commending him for outstanding police work. He attempted to remove it from the personnel office, but employee Debbie Wedderburn refused to allow him to do so without the approval of the Human Resources manager. Fernandez threatened to write a police report for theft. (Fernandez Depo. at 162–63, 574–79), Ex. 345).

On November 6, 1996, UM Associate Vice President Alan Fish met with Fernandez to discuss this incident. Fish told

---

**11.** Neither Garcia–Montes, Silva, or Allen have asserted claims against the defendants for retaliation, violations of due process and the First Amendment, or under the whistleblower statutes. These claims are raised only by Allocco and Fernandez.

Fernandez that he had demonstrated poor judgment and had created an atmosphere of intimidation. Fish confirmed the content of the meeting in a November 12, 1996, memorandum, and he further advised Fernandez that future actions of a similar nature would result in his termination. (Fernandez Depo. at 574–79; Fish Decl. at ¶ 7). Fernandez states that he contemplated arresting Fish for obstruction, but he did not do so. (Fernandez Depo. at 578–79).

### 3. Investigation Involving UM Athletes

In January of 1996, Allocco was involved in an IA investigation involving the question of whether UMPSD was giving football players special treatment. Allocco gave his statement in March of 1996 and was represented by George Hachigan, the attorney he obtained by joining the FOPA and Labor Council. On August 1, 1996, the complaint was not sustained. (Def.Ex. 550). Although Allocco was not disciplined as a result of the IA, Allocco admits that he is still upset because he feels he should have been exonerated. (Allocco Depo. at 267–70, 531–32, Ex. 550).

### 4. Fernandez's Failure to Provide Statistical Report

On August 9, 1997, Fernandez was suspended by UM for refusing to provide a monthly statistical report. (Fernandez Depo. at 597–604, Ex. 364). UM officers are required to complete daily and monthly activity reports showing how much time they have spent engaging in various activities. At the end of the month, sergeants review the activity reports for their subordinates, add up the numbers, and give the reports to UMPSD Captain Clusman, who then gives them to Director Christensen.

Fernandez told Clusman and Christensen that he would not provide the statistics because CGSOP 47 mandated the proper method for reporting crime, and UM's monthly reports did not comply with CGSOP 47. (Fernandez Depo. at 599–601). According to Fernandez, UM's method of gathering statistics violated the Clery Act, which requires the reporting of crimes on campus. Clusman and Christensen deny that Fernandez ever mentioned the Clery Act to them or expressed concern about UM's reporting of crime statistics. (Fernandez Depo. at 599; Clusman Decl. at ¶ 51; Christensen Decl. at ¶ 28).

Fernandez testified that he provided the reports to Clusman and Christensen once they explained the importance of the information. Nevertheless, Christensen felt it was necessary to suspend Fernandez because he had refused to obey his supervisors' orders. (Christensen Decl. at ¶ 25). Fernandez wrote a letter to Christensen on August 19, 1997, disagreeing with the suspension on the basis that CGSOP 47 did not require Coral Gables sergeants to complete a monthly report, and he requested copies of UM's rules and grievance procedures. (Fernandez Depo. at 914–15). Christensen responded that the monthly report was not the same document outlined in CGSOP 47. He also provided Fernandez with a copy of the UM rules and grievance procedure, reminding him that he could find the information on the UM website. (Christensen Decl. at ¶ 56)

### 5. April 1998 Radio Report

On April 7, 1998, Allocco wrote an information report on a CGPD incident report "to make public the hazardous communication system in effect at Coral Gables Police

Department's Univ. of Miami Division also misnomered as the University of Miami Public Safety Department." (Allocco Depo. at 605, Ex. 408). The report followed an incident during which a visitor of the UM campus had died. Allocco claims that the death resulted, at least in part, because officers from the same department were unable to communicate with each other though UM's radio system. (Allocco Sworn Stmt. at 12). In the report, Allocco stated his opinions about the communications systems that were provided to UMPSD officers. (Def.Ex. 408, 416). He signed the report both as the officer writing it and the supervisor approving it because he did not believe another supervisor would approve it. (Allocco Depo. at 318, Ex. 416 p. 6).

Prior to writing this report, Allocco raised the issue regarding radio equipment problems with Captain Clusman and UMPSD Director Christensen. (Allocco Depo. at 310–11). Allocco contends that the UMPSD did nothing to remedy the situation, even though he raised this problem as early as his petition of October 10, 1996 (Def.Ex. 353). Among the problems Allocco related to Clusman and Christensen were the inferiority of the radio equipment, batteries that did not work, unreliable dispatch radios, static, and interference from taxi companies, airlines, and shipping companies. (Allocco Depo. at 312).

On April 13, 1998, the CGPD initiated an IA investigation into Allocco's behavior to determine whether Allocco had violated the report writing rules and stated his personal opinions in an official police report without adequate investigation. (Allocco Depo. at 323, Ex. 411). On April 27, 1998, Allocco wrote a letter to Christensen asking for information regarding UM's legal defense plan for officers involved in IA investigations. (Allocco Depo. at 324, Ex. 412). Allocco also asked whether, as a UM employee, he was obligated to participate in the City's IA process. (Allocco Depo. at 324, Ex. 412). On May 4, 1998, Christensen informed Allocco in writing that UM provided up to five hours of legal representation for UM police officers and gave him a list of approved attorneys. Because Allocco was not happy with the selection of attorneys UM provided to him, and UM would not pay for counsel he chose, Allocco began looking for his own attorney. (Allocco Depo. at 332, 334, Ex. 415).

On September 8, 1998, Allocco received notice of a predetermination hearing set for September 15, 1998. On September 10, 1998, Allocco wrote a letter to UMPSD Director Christensen demanding information as to why certain people at CGPD were invited to the hearing. He also alleged that Christensen had taken no action to ensure that Allocco's rights were not violated. (Allocco Depo. at 345, 347–50, Ex. 419, 421). Allocco referred to the fact that plaintiff Fernandez had been suspended in August of 1997 for violating an "unheard of policy", requested copies of UM policies Christensen expected him to follow, and requested a copy of UM's grievance procedure. (Def.Ex. 421). Allocco concluded this letter to his commanding officer by stating in bold, "Written response required." (Def.Ex. 421).

Allocco attended the predetermination hearing, which took place on September 15, 1998. He provided written information for consideration by the panel. On October 26, 1998, CGPD Chief Skinner advised UMPSD Director Christensen of the determination that the IA complaint regarding the radio report had been sustained. Skinner advised that, because Allocco was a UM employee, he was referring the mat-

ter of appropriate discipline to UM. (Allocco Depo. at 357–58, Ex. 434).

On November 23, 1998, UMPSD Director Christensen and UM Human Resources Manager Zanyk met with Allocco to ask him questions regarding the radio report incident. The meeting was set in order to give Allocco an opportunity to explain his actions before UM determined the appropriate discipline to administer, but Allocco refused to meet if Zanyk was present. "I think I told Henry that I had a problem opening up a dialogue concerning ongoing internal affairs investigation with a UM civilian." (Allocco Depo. at 362–64, Ex. 426). Allocco also informed Christensen that he wanted his coplaintiff, Fernandez, to be a witness in the meeting with Christensen and Zanyk, but UM advised Allocco that Fernandez could not attend. (Allocco Depo. at 366–67, Ex. 426).

On November 15, 1998, Christensen wrote Allocco a letter, reminding him that he was a UM employee and that Allocco was aware that CGPD Skinner had sustained the IA charges against him and referred the matter of discipline to UM. He further advised Allocco that UM had scheduled the meeting three times and that he had until 5:00 p.m. on Monday, November 30, 1998, to schedule another meeting. If Allocco did not attend, UM would make a decision without his input. (Allocco Depo. at 372, Ex. 428).

On November 29, 1998, Allocco responded to Christensen's letter by stating, "I see that you and Mr. John Zanyk are pushing me into discussing my Coral Gables Internal Affairs Case." Allocco advised that he could not "see the link between a private employer intervening in a police investigation/disciplinary matter". Allocco asked for detailed information on what authority Christensen was acting under and what to expect at the meeting. At the end of the letter, Allocco again asked for a written response. (Allocco Depo. at 378, Ex. 429). Christensen responded on December 1, 1998, advising that Allocco would not be disciplined for refusing to attend the meeting, that Zanyk was only assisting in the process, and that Allocco had two hours to decide whether to meet. Otherwise, they would make a decision without Allocco's input. (Allocco Depo. at 379, Ex. 430). Allocco eventually met with Christensen and Zanyk on December 2, 1998.

On December 18, 1998, Christensen suspended Allocco for three days, finding that his failure to follow proper report writing procedures and his lack of judgment in preparation and submission of the 1998 radio report was a serious breach of his responsibilities. (Allocco Depo. at 386, Ex. 434). Allocco was told to return to work on December 26, 1998. (Def.Ex. 434).

### 6. Complaint by UM Dean Richard Walker

On December 9, 1998, Allocco and Fernandez were notified that the IA Unit was conducting an investigation of his activities based upon a complaint by UM Dean Richard Walker. According to the notice, Walker complained that on November 11, 1998, Allocco displayed "discourteous and unprofessional behavior by yelling at him and threatening him with arrest" relating to an incident involving an illegally parked vehicle. (Allocco Depo. at 397; Fernandez Depo. at 638–40, Ex.370, 439). Allocco gave a statement in connection with this IA on March 17, 1999, and the charges were found "not sustained" on July 19, 1999. (Allocco Depo. at 400–01).

### 7. Allocco Files Complaint Against CGPD Chief Skinner

On December 15, 1998, Allocco wrote to City Employee Relations Director Katz

complaining that Chief Skinner had engaged in "gross neglect and mismanagement" and requesting information on his appellate/grievance procedures regarding the IA finding. (Allocco Depo. at 384, Ex. 433). The alleged gross neglect and mismanagement was comprised of the flawed IA investigation, the Chief's statements to CALEA that the UMPSD was a separate agency, the two-radio procedure about which Allocco complained in his report, official tow sheets being used for private purposes, and turning over confidential information to a private entity to let them decide how they will discipline a public employee. (Allocco Depo. at 384–85). The City's counsel responded to Allocco's letter on January 6, 1999, advising him that the City's appeal procedures did not apply to him because he was not a City employee. He was advised to use UM's appeal process. (Def.Ex. H).

Prior to the City counsel responding to Allocco's letter, Allocco asked UMPSD Director Christensen for information on the procedures that apply to UM officers who are being investigated through the IA process. On December 18, 1998, Christensen wrote to Allocco and advised him that, pursuant to CGSOP 28, when IA complaints are investigated by the City, they follow the City's rules. "It has been their practice to utilize the same procedure for investigation and predetermination hearings for UMPSD officers as for other officers." (Christensen Decl. at ¶ 39, Ex. 435). Christensen also advised that provision of counsel is governed by UM Policy 2–0006(1) and that appeal procedures depended upon which entity imposes the discipline. If the City imposes the discipline, Allocco should follow its appeal procedures, but, if UM imposes the discipline, Allocco should follow UM Policies and Procedures. (Christensen Decl. at ¶ 39, Ex. 435).

## 8. Bicycle Patrol by UMPSD and the UM Junior Orange Bowl Parade

On December 15, 1998, Chief Skinner issued a memorandum advising that the 1969 agreement between UM and the City authorizes the UMPSD officers to be appointed as part-time officers, but it does not authorize UMPSD supervisors to function as law enforcement supervisors for CGPD. (Allocco Depo. at 464–65, Ex. 369). The memorandum further advised that, effective December 21, 1998, CGPD supervisors would be responsible for reviewing and approving all law enforcement actions carried out by UMPSD officers, including reviewing and approving police reports, arrests, and responding to calls where a supervisor was required to respond. (Ex. 369). As a result of this memorandum, Allocco concluded that Christensen and Clusman no longer had any supervisory authority over him.

On December 16, 1998, Clusman issued a memorandum to UMPSD sergeants advising that bicycle officers were not to ride together and that there would be only one bike patrol officer per shift. (Clusman Decl. at ¶ 43, Ex. 375). Clusman told plaintiff Fernandez that this was done to provide better coverage on campus and because he did not want officers riding together. (Clusman Decl. at ¶ 44).

In the first week of January of 1999, CGPD Chief Skinner contacted UMPSD Director Christensen and asked whether he knew that Fernandez and Allocco were seen riding their bicycles together at the Orange Bowl Parade on December 30, 1998, while they were on duty. According to Skinner, this was a function that occurs several miles away from the UM campus, and it was staffed by City police officers. He contends that UM police were not authorized to work the detail. (Skinner

Decl. at ¶ 7). Because Christensen believed that the officers' actions may have been unauthorized and contrary to Clusman's December 16, 1998, memorandum, which prohibited officers from patrolling together on bicycles, Christensen asked Chief Skinner to provide him with information regarding who had seen or interacted with Fernandez and Allocco during the parade. (Christensen Decl. at ¶ 42).

Approximately one week later, Christensen received three memoranda from CGPD officers Gibbons, Frevola, and Cuervo. The officers stated that they saw Fernandez and Allocco riding together on their bicycles while wearing their uniforms at the parade. The nature of the conversations between the officers, Fernandez, and Allocco was casual and did not appear to have a business purpose. (Christensen Decl. ¶ 43, Ex. 375). Additionally, a review of the UMPSD dispatch log indicated that dispatch had not been notified that Fernandez would be leaving campus during the parade. (Christensen Decl. at ¶ 43).

This information led Christensen to believe that Allocco and Fernandez had violated Clusman's memorandum. As a result, on January 19, 1999, Christensen asked Allocco and Fernandez to meet with him to discuss the events. (Christensen Affid. at ¶ 44, Ex. 375). When Christensen attempted to ask Allocco and Fernandez questions, they told Christensen they did not want to discuss the incident "if there was an ongoing Internal Affairs investigation". Moreover, Fernandez told Christensen that "it would be against the law to talk with Christensen about these things since Christensen no longer had any supervisory authority", referring to Skinner's December 15, 1998, investigation. (Fernandez Depo. at 662–64). Christensen nei-

ther admitted nor denied that there was an investigation, but he advised the plaintiffs that their refusal to meet could be considered insubordination. (Allocco Depo. at 389).

On the next day, when Allocco again refused to discuss the events surrounding the parade due to his belief that the questions were being asked in the wrong forum, he was terminated by Christensen. (Allocco Depo. at 389, Ex. 437; Christensen Decl. at ¶ 50). Following Allocco's termination, Christensen notified the CGPD, which then revoked Allocco's oath of office. (Allocco Depo. at 394, Ex. 438).

As for Fernandez, he agreed to discuss the incident with Christensen on January 20, 1999. When asked about the parade, Fernandez professed a complete lack of memory. (Def.Ex. 375). On January 22, 1999, Fernandez and Christensen met again, but Fernandez gave Christensen "very vague and sketchy answers". (Christensen Decl. at ¶ 48, Ex. 375). On January 27, 1999, UM terminated Fernandez's employment. (Christensen Decl. at ¶ 49). On February 1, 1999, Fernandez was presented with a termination letter. The letter explains that UM had found that Fernandez had been insubordinate in refusing to cooperate in the investigation of the December 30, 1998, parade, that he had violated Clusman's directive regarding bicycle patrol, that his comments indicated he had no intention to abide by the directive, and that he had left the campus without coverage or notifying dispatch. (Christensen Decl. at ¶ 9, Ex. 375). Upon being notified of Fernandez's termination, CGPD revoked Fernandez's oath of office and filed an affidavit of separation with FDLE. (Fernandez Depo. at 673, 1019). Fernandez did not file a grievance relating to his termination with UM or the City. (Fernandez Depo. at 1020, 1023–24).

Although the plaintiffs did not explain to their supervisors their reasons for being at the parade, they have attempted to do so in their sworn statements in opposition to the defendants' motion. According to the plaintiffs, Fernandez was looking for CGPD officers to work a late shift on December 30, 1998. Because Allocco did not want to work late that day, he agreed to ride on his bicycle with Fernandez to find officers willing to work the shift. (Allocco Sworn Stmt. at 18). Although the plaintiffs came across officers Cuervo, Gibbons, and Condon, none of these officers wanted to work late that day.

Sometime later, Gibbons told Fernandez and Allocco that he was ordered to provide a memorandum about his encounter with Fernandez and Allocco on December 30, 1998. The plaintiffs claim that Gibbons informed them that "the City was out to get them, and that it was a witch hunt." (Gibbons Affid.; Allocco Sworn Stmt. at 18–19; Fernandez Sworn Stmt. at 26).

### B. Allocco's and Fernandez's Alleged Whistleblower Activities

Allocco's alleged whistleblower activities include allegations that UM and the City violated the Clery Act [12], that the City made misrepresentations to CALEA in connection with the City's pursuit of accreditation, that UM was housing confidential records, and that UMPSD's radio system was problematic. Fernandez's activities include allegations that UM and the City violated the Clery Act and that the City made misrepresentations to the CALEA. Each of these are explained in more detail below.

### 1. The Clery Act

As to the Clery Act, Allocco asserts that UM's deans administratively handle crimi-

nal matters involving students; that arrest reports involving students disappear; and that UM officers were instructed to write burglaries as "thefts". Allocco and Fernandez allege that these situations result in crimes on campus being underreported. (Allocco Depo. at 639, 643, 646, 657, Ex. 463). Allocco admits that the City was not involved in and has no knowledge of any of these issues. (Allocco Depo. at 636, 642, 651–53).

As to the handling of criminal matters by deans, Allocco is referring to situations in which an administrator learns about students engaging in criminal activities, such as smoking marijuana, aggravated battery, or vandalism, and, rather than notifying UM police about the activity, the administrator conducts an administrative disciplinary hearing. (Allocco Depo. at 643–44). Regarding arrest reports disappearing, Allocco contends that he is aware of a situation in 1997 or 1998 in which UMPSD Detective McCain allegedly was told to go to the CGPD and dispose of an original arrest report. Allocco has no personal knowledge of this subject, but simply heard it through another UM officer. (Allocco Depo. at 640–43).

Allocco admits that he never complained verbally or in writing to anyone at UM about these alleged violations. (Allocco Depo. at 645–46). Rather, he reported these violations to the City when he attempted to file an IA complaint against Skinner sometime between June of 1998 and October of 1998. (Allocco Depo. at 572, 635). He never was able to file a successful IA complaint because Skinner walked into the room, and the officer taking Allocco's statement refused to take the

---

**12.** The Clery Act, 20 U.S.C. § 1092, requires United States colleges and universities to collect and publish data on student safety, campus security policies, and campus crime statistics.

complaint. (Allocco Sworn Stmt. at 21). He also might have reported these violations to the FDLE and the State Attorney's Office. (Allocco Depo. at 637–38). Although he spoke to CGPD Detective Walker Money or Lieutenant Lennie Hill at that time, Allocco cannot remember what he said about UM or the City violating the Clery Act. (Allocco Depo. at 636–37). Allocco did not put any of this information in writing.

As to the reclassification of crimes, Allocco testified that, from the time he completed his training in September of 1994, he was told by Clusman and Christensen to report crimes that would constitute a burglary as theft, which is a less severe criminal category. (Allocco Depo. at 646). During his deposition, Allocco admitted that he could not recall any specific incidents where he had to comply with these instructions. (Allocco Depo. at 651–53).[13]

Like Allocco, Fernandez alleges that his whistleblowing activities are related to the Clery Act. He claims that the crime statistics reported by UM in the Safety on Campus Brochure were incorrect because crimes were underreported and downgraded by UM. (Fernandez Depo. at 857, Ex. 463). Fernandez admits that he first became aware of the Clery Act in August of 1997. (Fernandez Depo. at 912–13).

Even though Fernandez believes crimes have been underreported, he admits that he has no evidence that the City and UM have conspired to under-report crimes.

(Fernandez Depo. at 815). Rather, his belief that crime statistics are underreported stems from his assumption that in situations where a crime originates on campus, that the crime is not actually reported as a campus crime if the victim returns to a location off campus and then calls the police. There are only two incidents in which Fernandez is aware that this type of underreporting may have occurred. One involves the robbery of a pizza delivery man, and the other incident involves a female overdosing in a campus dormitory. (Fernandez Depo. at 822–30).

As to the downgrading of crimes, Fernandez alleges that UM does not report all burglaries that occur, especially those relating to vehicles. He recalls that, in a particular weekend, twenty-six vehicle burglaries occurred, but the crime statistics for that year did not reflect that number. (Fernandez Depo. at 859). Fernandez admits that he does not know whether the reporting standards define a burglary differently than state law. It is undisputed, however, that reporting standards do, in fact, define a burglary differently under certain circumstances. (Baixauli Decl. at ¶ 11; Clusman Decl. at ¶ 51).

Fernandez alleges that he reported his concerns to UMPSD Director Christensen and to the City. This conversation occurred when Fernandez was suspended in August of 1997 for refusing to turn in his monthly activity reports. As to the City, Fernandez says he made an effort to report the situation to CGPD Detective Mon-

---

**13.** In response to the defendants' statement of facts, Allocco submitted a verified statement of facts, in which he describes an incident in which UMPSD Captain Christensen asked him to rewrite a police report involving a campus burglary as a theft. Allocco does not provide any dates or specific information about this incident. In any event, Allocco cannot supplement or contradict his deposition testimony by a self-serving affidavit. *See Johnston v. Henderson,* 144 F.Supp.2d 1341, 1360 (S.D.Fla.2001) (granting defendant's motion for summary judgment because plaintiff's self-serving, conclusory affidavits failed to create genuine issues of material fact).

ey when he tried to initiate an IA complaint against CGPD Skinner in late 1998, but he admits that he did not actually do so. (Fernandez Depo. at 867–68). Fernandez also placed a copy of his August 11, 1997, letter to UMPSD Christensen in Chief Skinner's mailbox at the CGPD. This letter outlined Fernandez's disagreement with his August 1997 suspension, but Fernandez never discussed his letter with anyone at the City. (Fernandez Depo. at 916).

### 2. Alleged Misrepresentations by the City to CALEA

On March 11, 1998, Allocco sent an email to CALEA complaining that, when CALEA inspectors came to the City to determine whether it met CALEA's accreditation standards, they did not visit UM. (Allocco Depo. at 619–20, Ex. 366). On April 29, 1998, Allocco sent another email to CALEA detailing what he perceived to be inequities between the police officers at UM and the City. (Allocco Depo. at 621–22, Ex. 517). At the end of this email, Allocco asked that CALEA not forward it to the CGPD because he had heard that the City was angry at him due to his prior communications with CALEA. Fernandez was aware of these e-mails, but he did not participate in drafting or sending them. (Fernandez Depo. at 614–16, 941).

On January 7, 1999, Allocco sent a third written communication to the CALEA in the form of a letter. (Allocco Depo. at 628–29, Ex. 374). This letter was signed by ten other officers. Of the eleven signatories, six, including plaintiff Garcia–Montes, continue to work for the UMPSD. (Clusman Decl. at ¶ 34). Fernandez also signed this letter.

On either March 2 or 3, 1999, Allocco and Fernandez met with Gwinnett (Geor-gia) County Police Department Chief Dean when he came to Miami to investigate the allegations made in the January 7, 1999, letter. (Allocco Depo. at 634, Ex. 446, 557; Fernandez Depo. at 946, 948–51). Chief Dean also spent time at the CGPD investigating the allegations. Following his inspection, he wrote a full report finding that the CGPD and UMPSD were separate, identifiable policing agencies and that UM officers were not City employees. (Christensen Decl. at ¶ 51, Ex. 557 at 10–11).

### 3. Complaint About Communications Systems

Allocco's alleged whistleblower activity relating to the communications system stems from his complaints that UM's practice of requiring UM officers to carry two radios (a UM radio and a CG radio) creates communications problems. Allocco set forth these allegations in his radio report of April 7, 1998. (Allocco Depo. at 310, Ex. 408).

On October 20, 1998, Allocco wrote a letter to City Attorney Hernandez claiming whistleblower protection for having raised the radio issue. (Allocco Depo. at 355, 574–75, Ex. 423). Allocco also mentioned in this letter that he had complained to CALEA about alleged misrepresentations by the City in connection with the accreditation process. Finally, Allocco informed Hernandez that he had heard that CGPD Skinner and City Manager Eades were both displeased with him for writing the police report regarding the radio equipment and that the City was going to take action against him. (Allocco Depo. at 584–91).

Allocco admits that he had begun to complain about the radio systems as early as October of 1995 and October 1996, when

he signed a petition, which also was signed by plaintiffs Fernandez, Garcia–Montes, Allen, and other officers. (Allocco Depo. at 209–10, 448–49, Ex. 353). The petition was motivated by the CGPD officers' awareness that they were working with inferior radio equipment. Additionally, their police cars were not equipped with fire extinguishers, cages, flares, and other items. (Allocco Sworn Stmt. at 8). The petition stated, "As anyone can see, there are very large discrepancies between Coral Gables UM patrol officers and regular Coral Gables officers". (Fernandez Depo. at 569–71, Ex. 353). The plaintiffs admit that UM eventually addressed some the issues raised by the petition, following a meeting attended by UM officers and UM Vice President Fish. (Allocco Depo. at 209–10, 448–49, 581; Fernandez Depo. at 572).

On December 11, 1998, Allocco received a response to this letter, which advised him that any IA investigation by the City regarding the radio report was merely advisory in nature because he was a full-time UM employee. (Allocco Depo. at 382, Ex. 432).

## C. Alleged Protected Speech

Allocco and Fernandez claim that the defendants have violated their speech rights. Allocco's and Fernandez's alleged protected speech includes communications with newspaper reports in 1997 and 1998, writing the April 1998 radio equipment report, their communications to the CALEA, and the attempt to file an IA against Chief Skinner. (Allocco Depo. at 662–63; Fernandez Depo. at 952–54).

### 1. Media

On December 30 1998, the *New Times* mentioned Allocco in an article about security on campus. The article also discussed the IA complaint filed on Allocco by Chief Skinner. In 1997, the UM campus newspaper wrote an article about the 1997 lawsuit. Allocco has no knowledge as to whether CGPD Skinner or the City Manager read any of the articles in which Allocco was quoted or mentioned. (Allocco Depo. at 667–69).

According to Fernandez, he provided information to newspapers on several occasions, although he cannot specifically recall the dates. (Fernandez Depo. at 957–58). Like Allocco, Fernandez communicated with newspapers about his complaints against UM and the City, but he was not sure if he was quoted in a published article. Fernandez does not know if supervisors at CGPD or UMPSD read these articles, but he claims that he dropped off copies for Skinner of the UM campus newspaper on three separate occasions. (Fernandez Depo. at 962–65).

### 2. Communications With Governmental Agencies

Allocco and Fernandez claim that their communications with governmental agencies are protected. For example, prior to June 11, 1998, Allocco spoke with Lee Zuranick of the FDLE by telephone. He asked her how the UM officers were classified for FDLE purposes, and she responded that they were part-time. (Allocco Depo. at 536–37). Allocco told Zuranick that the UM officers worked forty hours per week, and she told him that she would investigate whether they were properly classified. Allocco never heard back from Zuranick, and he does not know whether she communicated with the City or UM about the issue he raised. (Allocco Depo. at 536–37).

On June 11, 1998, Allocco and Fernandez went to FDLE and met with several

people to complain about the relationship between UM and the City. Allocco also claims that they discussed other illegal activities that were occurring, such as the use of official machines for private purposes, the release of confidential information to UM administrators, and the underreporting of crimes on campus. (Allocco Sworn Stmt. at 13). At the end of the meeting, the FDLE representatives told Allocco and Fernandez that they were going to check with the State Attorney's Office before initiating an investigation into possible public corruption. (Allocco Depo. at 539–41). Allocco and Fernandez do not know whether the FDLE ever contacted the State Attorney's Office, nor did they hear back from the FDLE.

As a result, Allocco and Fernandez went to the State Attorney's Office in August or September of 1998. They spoke with attorney Howard Rosen and told him that they believed that the contractual relationship between UM and the City was illegal, and they informed him of other acts engaged in by the defendants that they believed to be illegal. (Allocco Depo. at 551–52; Fernandez Depo. at 685–88, 981–82). The plaintiffs do not know whether the State Attorney's Office ever began an investigation because it did not get back to them. Although the plaintiffs do not know whether the State Attorney's Office ever contacted UM or the City, they assume that the defendants learned of their meeting with the State Attorney's Office because the plaintiffs ran into CGPD officers as they were leaving the State Attorney's Office. (Allocco Depo. at 686–87; Fernandez Depo. at 686–87).

### 3. IA Complaint Against Skinner

The final allegation regarding protected speech relates to the plaintiffs' attempt to file an IA complaint against CGPD Chief Skinner. Fernandez, Allocco, and Silva went to the CGPD IA Unit sometime between June and October of 1998. According to Fernandez, as they were explaining to CGPD Detective Money the problems they felt resulted from the contract between UM and the City, Chief Skinner walked in, introduced himself, and inquired as to their purpose. (Fernandez Depo. at 955). Fernandez told Skinner that "we are going to file an IA complaint ... to bring to light the illegalities that were going on at the University and Gables turning a blind eye to it." (Fernandez Depo. at 955). Skinner asked what they were talking about, and Fernandez responded, "We can start down the list with the Standard Operating Procedure, how you're not adhering to it and you're not ensuring that they're properly applied." (Fernandez Depo. at 955). Fernandez did not get into the specifics of the allegations, but he told Skinner, "If they wouldn't take the complaint, that we were definitely going to the media." (Fernandez Depo. at 956).

### D. Alleged Adverse Employment Actions

#### 1. Allocco

Allocco alleges that the adverse actions he suffered include being denied promotional eligibility in 1997, denied specialized training in 1996 or 1997, suspended without pay, denied the right to have his IA investigations completed within forty-five days, denied the right to give the IA findings, denied the right to have an attorney present for his questioning prior to suspension and termination, and being terminated. (Allocco Depo. at 680–81, 684, 689).

As to the training, Christensen claims that he denied this request because it was

unreasonable for Allocco to attend detective, SWAT, and homicide training in light of the fact that UMPSD did not have a SWAT team, did not investigate homicides, and already had a detective. (Christensen Decl. at ¶ 58). Allocco does not know whether the City was involved in the denial of his training requests, nor does he know whether the training would have resulted in a pay increase. (Allocco Depo. at 681–83).

As to the IA investigations, Allocco claims that the three investigations in which he was involved (student athlete, radio equipment, and Dean Walker) took longer than forty-five days. Allocco does not know whether he was treated any differently than any other City officers involved in an IA investigation. (Allocco Depo. at 686–88). UM did not conduct Allocco's IA investigations and had no control over how long they would last.

#### 2. Fernandez

Fernandez claims that the retaliation he suffered included being placed on the afternoon shift, not being able to use the CGPD gym, his August 1997 suspension, and his termination. As to the scheduling, Fernandez alleges that he and Allocco were placed on the afternoon shift. According to Fernandez, this was the busiest shift, but the defendants contend that the morning shift was busier. (Fernandez Depo. at 1001; Clusman Decl. at ¶ 41). Fernandez cannot recall when he was placed on the shift.

Regarding the gym, Fernandez contends that he was allowed to use the City's gym "for years". Chief Skinner denied Fernandez this privilege on January 5, 1999, when he wrote a letter to UMPSD Director Christensen, advising him that the City gym was for the use of City police and fire employees only, not UM police. Fernandez was not the only UM officer affected by Chief Skinner's letter because other UM officers were using the City gym, including at least one who continues to be employed by UM. (Fernandez Depo. at 1002–04).

#### E. Due Process Claim

In his due process claim, Allocco claims that his property interest consisted of his status as a public employee performing a public service. (Allocco Depo. at 700). Allocco also claims that he was stigmatized in the Affidavit of Separation filed by the CGPD with the FDLE, which states that the reason for his separation as a City part-time officer was "Other". (Allocco Depo. at 702). A review of the form indicates that it does not state a reason for Allocco's separation. Allocco did not learn that the City had represented to the FDLE that he had been terminated for "Other" reasons until he applied for a job with the Broward Sheriff's Office at a later date. As to Allocco's procedural due process claim, he contends that he should have had a grievance hearing, the right to have an attorney present when Christensen questioned him about his activities at the Junior Orange Bowl parade, and the right to clear his name prior to being terminated.

Fernandez alleges that his due process rights were violated in the procedures leading up to his termination. Fernandez also claims that the City denied him due process by making stigmatizing statements in the Affidavit of Separation filed with FDLE, but the only false statement he identifies is the reference to his substandard performance. (Fernandez Depo. at 1020).

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202(1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. Sept. 1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142(1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *See Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513.

### Analysis

The heart of this case is the City's classification of UMPSD officers as "regular" and "part-time" City officers. The parties devote a substantial amount of their arguments to the legitimacy of this classification. The defendants discuss the history behind the classification and their motivation for designating UM officers as "part-time" City officers. They contend that the classification is valid because it was approved by the FDLE in 1976 and 1992. The plaintiffs, on the other hand, argue that their classification as part-time officers is an illegal delegation of police powers to a private entity and a mischaracterization of their actual status.

At the outset, the court must note that the plaintiffs' arguments in opposition to summary judgment are problematic because the legitimacy of the plaintiffs' part-time status is not the issue that is before the court, as this matter was not raised by the allegations of the fifth amended complaint. Similarly, the court cannot undo the plaintiffs' status as part-time officers, nor can it inquire into whether it was fair for the defendants to deny the plaintiffs the salaries and benefits of full-time officers, despite the fact that they worked forty or more hours per week. Rather, the court only can decide the claims and issues that have been raised by the plaintiffs' fifth amended complaint and the defendants' motion for summary judgment. As for those claims, the plaintiffs have failed to introduce sufficient evidence so as to raise genuine issues of material fact on any counts raised by their complaint. As a result, the defendants are entitled to summary judgment.

### I. Count I: Negligent Misrepresentation

All of the plaintiffs have asserted a negligent misrepresentation claim against UM. According to the plaintiffs' complaint,

among the representations made by UM were that they would be hired as full-time employees, able to transfer to the City, protected by the Policeman's Bill of Rights, and had jurisdiction throughout the City. The plaintiffs' claim for negligent misrepresentation fails for the reasons that follow.

## A. The Defendants Did Not Make Any Misrepresentations

In order to establish a claim for negligent misrepresentation, a plaintiff must show the following: (1) a misrepresentation of material fact; (2) that the representor either knew or should have known was false or made without knowledge of truth or falsity; (3) the representor intended to induce another to act on the misrepresentation; and (4) resulting injury to a party acting in justifiable reliance on the misrepresentation. *See Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir.1993) (citing *Hoon v. Pate Constr. Co., Inc.*, 607 So.2d 423, 427 (Fla. 4th DCA 1992)); *Fla. Women's Med. Clinic, Inc. v. Sultan*, 656 So.2d 931, 933 (Fla. 4th DCA 1995); *Baggett v. Elec. Local 915 Credit Union*, 620 So.2d 784, 786 (Fla. 2d DCA 1993).[14] The defendants' motion for summary judgment on count I must be granted because the plaintiffs have not produced any evidence to satisfy the first requirement for negligent misrepresentation. That is, there is no evidence that the defendants ever made any misrepresentations of material fact.

In their opposition to the defendants' motion, the plaintiffs claim that the defendants have made the following misrepresentations:

A. All Plaintiffs applied for full time law enforcement positions as advertised or discussed.

B. All Plaintiffs' job descriptions were the exact same as any other City police officer;

C. Paychecks always said "police officer" on them;

D. All Plaintiffs were required to take the same tests as the other City officers;

E. All Plaintiffs were required to take polygraph exams, a practice prohibited by federal law for a private entity;

F. All Plaintiffs were told that the City Chief of Police was their superior officer;

G. All Plaintiffs were required to attend oral interviews in which a high ranking member of City attended;

H. All Plaintiffs were sworn in by the Chief of Police as regular police officers;

I. All Plaintiffs were given City employee badges naming them City employees including an and employee number, employment date, as well as stating the duties of a Regular Police Officer of the City of Coral Gables;

J. All Plaintiffs attended field training conducted by the City;

K. All Plaintiffs attended target practice at the City;

L. All Plaintiffs were told to follow and refer to the City SOP's for direction on how to perform their job;

M. For each Plaintiff, the City kept personnel files subject to public inspection and containing performance evaluations purportedly done by UM;

14. It is undisputed that counts I, III, VI (first), VI (second), and VIII are governed by Florida law.

N. All Plaintiffs were subjected to working 12 hour shifts when the City went to Alpha/Bravo shifts (12 hours on and 12 hours off);

O. Only Plaintiffs received comp time, a practice not given to any other UM "employees" as per FLSA;

P. All advertisements were for a full time police officer, not security guard, and even those mentioning UM did so only when it also named the UM Police Department, a department that does not exist and never could exist;

Q. All Plaintiffs were aware that a private entity could not have its own police department;

R. All Plaintiffs as police officers were charged with knowledge of the criminal and traffic codes and therefore charged with knowing that. . . .

(Pl. Opp'n at 24–26). All of these statements allegedly were made by the defendants in support of their ultimate misrepresentation—that the plaintiffs were City police officers with the same rights and benefits as other City employees.

The "misrepresentations" asserted by the plaintiffs above are either unsupported by the record or not misrepresentations at all. Statements A through M are all truthful and not disputed by the defendants. The plaintiffs have not pointed to, nor has the court found, any evidence in the record to support statements N and O. Statement P is truthful except for the clause "a department that does not exist and never could exist". As stated in the introduction to the analysis, the court cannot decide the legitimacy of the UMPSD because that issue was not raised by the fifth amended complaint or any of the pleadings in this case. Moreover, in *Estate of Marlin Barnes v. City of Coral Gables,* Case No. 97–918–DAVIS, Judge Davis reviewed the City–UM contract at issue in this case and rejected the argument that the relationship between the City and UM was an illegal delegation of power. *See Estate of Marlin Barnes v. City of Coral Gables,* Case No. 97–918–DAVIS, DE # 31 at 3. For these reasons, the court must assume, for purposes of this order, that the UMPSD was a proper delegation of police power by the City. The same is true for statement Q; whether or not UM could have a police department is not an issue before the court. The substatements contained within statement R are all either truthful statements or not before the court.

UM cannot be held liable for making any of these statements because, in order to establish a claim for negligent misrepresentation, the defendant must make a false statement. This conclusion follows the principle that "the heart of a claim for negligent representation is a false representation of fact." *See Hoon v. Pate Constr. Co.,* 607 So.2d 423, 428 (Fla. 4th DCA 1992) (finding that plaintiff failed to establish claim for negligent misrepresentation where the alleged misrepresentations were not false statements).

As for the plaintiffs' claim that UM informed them that they were entitled to the same rights and benefits as other City employees, there simply is no proof in the record to substantiate such an allegation. Only plaintiff Allen arguably has identified a misrepresentation. Allen testified that UMPSD Chief Curt Ivy told him, during his interview in 1980, that the starting pay and benefits of UM were "in parity" with that of the City officers. (Allen Depo. at 65–67, 178, 186). As will be discussed, however, this statement is not actionable because it is barred by the statute of limi-

tations. Absent evidence that UM has made any misrepresentations to the plaintiffs, the claim for negligent misrepresentation cannot stand.

### B. Plaintiffs' Reliance Was Not Reasonable

■ Even if the defendants did make representations to the plaintiffs or purposefully misled them into believing that they would be receiving the same rights and benefits as full-time City officers, the plaintiffs' claim for negligent misrepresentation still would fail because the plaintiffs' reliance on such statements or omissions would not have been reasonable or justified. In *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 696 So.2d 334 (Fla.1997), the Florida Supreme Court established the rule that an action for negligent misrepresentation cannot be maintained if an investigation by the recipient of the information would have revealed the falsity of the information. *Id.* at 377. The court distinguished claims for intentional or fraudulent misrepresentation, in which a recipient of information could rely on a representation without making an investigation, from a claim for negligent misrepresentation, where he cannot. *Id.* According to the court, a misrepresentor will be liable for negligent misrepresentation "only if the recipient of the information justifiably relied on the erroneous information." *Id.* Justifiable reliance will exist if "a reasonable person in the position of the recipient would be expected to investigate" the information. *Id.* at 339.[15]

In this case, the plaintiffs have brought a claim for negligent misrepresentation, not intentional or fraudulent misrepresentation. As a result, under *Gilchrist Timber,* the plaintiffs cannot recover if they could have discovered the falsity of the information or if they did not justifiably rely upon the defendants' statements. Analyzing this case under this standard, it is undisputed that the plaintiffs' misrepresentation claim fails because, not only was the falsity of the allegedly fraudulent statements in this case discoverable, but their falsity actually was known by each plaintiff.

Garcia–Montes admitted in her deposition that she was aware of the disparity in pay between UM and City officers at least by 1990, and she knew that UM officers left the department because of these disparities. (Garcia Montes Depo. at 182–83, 192). Garcia–Montes also was alerted to these differences by a May 6, 1993 memorandum, a 1995 memorandum, and a memorandum from UMPSD Director Eric Shoemaker. (Garcia–Montes Depo. at 181, 185–86, 204 Ex. 23, 32). She was made aware of her part-time City status upon reviewing CGSOP 28, the UMPSD Policies and Procedures Manual, and the Criminal Justice Standards and Training Commission Registration Form located in her employment file. (Garcia Montes Depo. at 284–86, 289–90, 292, 296 Ex. 17, 254). Moreover, in 1991, Garcia–Montes received a memorandum from UMPSD Director Shoemaker, which stated that the City ac-

---

**15.** Although the plaintiffs are correct that a jury usually should resolve the factual issue of the degree of negligence for which they could be held accountable in unreasonably relying upon the defendants' alleged representations, *see Gilchrist Timber,* 696 So.2d at 339, there is no question for the jury based upon this record because the plaintiffs have not disputed any of the facts presented by the defendants in support of summary judgment for this issue. Under such circumstances, a court may grant summary judgment on a fraud or misrepresentation claim. *See Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1307 (11th Cir.1999).

creditation process "brings our status as 'part-time Police' into question". (Garcia–Montes Depo. at 188–89, Ex. 88).

Although Allen claims that UMPSD Chief Curt Ivy falsely told him that UM pay and benefits was "in parity" with that of the City, the record also shows that enough facts were brought to Allen's attention to undermine Chief Ivy's alleged statement. As early as 1984, Allen explained the disparities between UMPSD and CGPD to UMPSD Detective Bert Pesa. (Pesa Depo. at 7–10). UMPSD's unrefuted testimony is that he had discussions with Allen about the fact that UM paid its officers less than what the City paid, and he also told him that the retirement and other benefits were not the same. (Seabolt Depo. at 13, 27). Following Hurricane Andrew, Allen was told by City officers how much they were making. (Allen Depo. at 79–80). In May of 1993, Allen attended a meeting in which UM Vice President David Lieberman openly discussed the differences in pay and benefits between UM and the City. (Allen Depo. at 186–89, Ex. 23, 24). Allen was just as aware of his status as a part-time UM officer, as Seabolt's and Pesa's unrefuted testimony is that they discussed this fact with Allen. (Seabolt Depo. at 22–23; Pesa Depo. at 12). Allen had an obligation to review the CGSOPs, which clearly reflect his classification as a part-time officer.

UMPSD Detective Bart Pesa has testified that, during Silva's application process to UMPSD, he explained to Silva the situation at UMPSD regarding pay, benefits, and the part-time classification. (Pesa Depo. at 35). Silva has not attempted to refute this statement. The record also shows that Silva attended a meeting in 1993, during which UM President Foote addressed the UM's officers concerns about the differences between UM and City officers. (Silva Depo. at 320; Gibbons Depo. at 58–61). Silva admits that he received CGSOP 28 in May of 1989, the date it was issued, and this SOP states that UM officers are designated as "part-time" Coral Gables officers. (Silva Depo. at 203, 372, Ex. 17, 266).

Allocco's knowledge of the differences between City and UM officers is evident from his petitions and complaints to the departments about the discrepancies. (Allocco Depo. at 446–49, Ex. 353). More importantly, the letter offering Allocco conditional employment with UM stated, "[Y]ou are not being offered employment with the City of Coral Gables or its Police Department. As such, this conditional offer of employment does not create any express or implied contractual rights to any policy, procedures or benefits of the City of Coral Gables or the City of Coral Gables Police Department." (Allocco Depo. at 122–25, Ex. 246) (emphasis in original). Allocco's signed acknowledgment of this letter indicates his awareness of its contents, and his knowledge is further substantiated by an IA report an CGSOP 28, both of which were read by Allocco. (Allocco Depo. at 71, 94, 248, 255, 267–70, Ex. 17, 150).

Fernandez's knowledge of his part-time status can be inferred from his having read the CGSOPs and the UMPSD Policies and Procedures Manual in preparation for his sergeant's promotion. (Gerlach Decl. at ¶ 9, Ex. 80; Fernandez Depo. at 260). UMPSD Detective Bart Pesa's unrefuted testimony is that he often discussed the differences in pay and benefits between UM and City officers with Fernandez. (Pesa Depo. at 32–34).

In addition to these facts, it is clear from the record that each plaintiff knew he or

she was paid by UM and received benefits only from UM. The plaintiffs cannot justifiably claim ignorance of the fact that they were receiving no benefits from the City when their UM paychecks, IRS forms, and pension benefits indicated that UM was the employer responsible for paying their salaries and conferring employment benefits. Such information would have come to light upon the plaintiffs' receipt of their first pay stub indicating the source of their pay and any deductions for applicable benefits. At most, the plaintiffs can argue that it was unfair for them not to be treated as full-time officers, but, in light of the overwhelming and undisputed evidence, they cannot claim ignorance of the fact that they were not afforded the same rights and benefits as full-time City officers as a result of their part-time classification. Because it would have been unreasonable, under these circumstances, for the plaintiffs to rely on any representation by the defendants that they were the same as full-time City officers, the plaintiffs' claim for negligent misrepresentation must be stricken.

## C. Statute of Limitations [16]

■ An action founded on fraud must be brought within four years of its accrual.[17] *See* Fla. Stat. § 95.11(3)(a); *Colonial Penn Ins. Co. v. Value Rent–A–Car, Inc.,* 814 F.Supp. 1084, 1099 (S.D.Fla.1992) (applying Florida's statute of limitations); *Sands v. Blando,* 575 So.2d 1306, 1307 (Fla. 3d DCA 1991) (same). Such an ac-

tion accrues at the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence. *See* Fla. Stat. § 95.031(2)(a); *Colonial Penn Ins. Co.,* 814 F.Supp. at 1099; *Sands,* 575 So.2d at 1307. The plaintiffs raised their negligent misrepresentation claim in the First Amended Complaint, which was filed on September 24, 1997. Thus, their claim is barred by the statute of limitations if they discovered or should have discovered their part-time status or the discrepancies in pay, benefits, and rights before September 24, 1993. The record demonstrates that each of the plaintiffs knew or should have known this information before September 24, 1993. As a result, their claim for negligent misrepresentation is time-barred.

In 1990, Garcia–Montes heard former UMPSD Officer Dennis Whitt discussing the disparity in pay between UM and City officers, and, in early 1993, Garcia–Montes learned that officers left the department because of these differences. (Garcia–Montes Depo. at 182–83, 192). Moreover, in May of 1993, she received a memorandum that compared the pay and benefits of the CGPD and UMPSD. (Garcia–Montes Depo. at 185–86, Ex. 23). In 1985 and 1989, Garcia–Montes came across information that discussed her part-time status. (Garcia–Montes Depo. at 284–86, 289–90; Pesa Depo. at 29–30).

In 1984, UMPSD Bart Pesa had a conversation with Allen about the disparities between UM and City pay and their part-

---

16. The plaintiffs do not address the defendants' arguments regarding the statute of limitations for negligent misrepresentation.

17. Under Florida law, negligent misrepresentation is treated as a form of fraud, not negligence. *See Watson v. Jones,* 25 So. 678, 683 (Fla.1899) (explaining that case for false ma-

terial statement negligently made is one of fraud); *Burton v. Linotype Co.,* 556 So.2d 1126, 1129 (Fla. 3d DCA 1989) (stating that negligent misrepresentation is tantamount to fraud). In any event, like fraud, the statute of limitations for negligence is four years. *See* Fla. Stat. § 95.11(3)(j).

time classification. (Pesa Depo. at 7–10). In August of 1992, City officers informed Allen about how much they were making per hour. (Allen Depo. at 79–80). During the same year, Allen heard discussions about UM officers' status as part-time police. (Allen Depo. at 159, Ex. 88). In May of 1993, Allen attended a meeting during which the pay, rights, and benefits of City and UM officers were discussed. (Allen Depo. at 193).

In 1987, when he applied to work for the UMPSD, Silva was told by Pesa about the part-time classification. (Pesa Depo. at 35, 38–39). In 1989, Silva received CGSOP, which states that UM officers are part-time City officers. (Silva Depo. at 372, Ex. 17). Silva attended a meeting held by UM President Foote in May of 1993, during which concerns about the differences between UM and City officers were discussed. (Silva Depo. at 320; Gibbons Depo. at 58–61).

Allocco learned that he would not be receiving the benefits of City officers when he received his conditional offer of employment in August of 1993. (Allocco Depo. at 122–25, Ex. 246). Fernandez learned, or should have learned, that he was classified as part-time in 1990, when he studied for the sergeant promotion, or in 1992, when he received a full set of CGSOP. (Fernandez Depo. at 260, Ex. 17). Additionally, Fernandez had learned about the pay and benefits differences at least by 1992, when he discussed these subjects with Pesa. (Pesa Depo. at 32–33).

As this discussion illustrates, each of the plaintiffs learned of the facts that could have given rise to their action for negligent misrepresentation before September 24, 1993, when the statute of limitations began to run. Accordingly, the defendants are entitled to summary judgment on count I of the plaintiffs' complaint.

## II. Count III: Conspiracy

In count III, each of the plaintiffs has asserted a claim against UM for civil conspiracy under Florida law. They claim that the defendants conspired to defraud them of benefits, wages, and other pecuniary advantages by inducing them to take jobs as UM officers under the false belief that they would be full-time City officers. In essence, they are alleging that UM and the City conspired to commit the fraud forming the basis of their negligent misrepresentation claim. At the outset, the court must note that it is not clear whether a conspiracy or scheme can exist to do something that is the basis of a lawful contract.[18] Here, the lawful contract is the City–UM agreement that gave rise to the designation of UM officers as part-time City officers. Assuming that a lawful contract can form the basis of a conspiracy claim, the court will proceed to analyze the merits of this count.

■■ Florida does not recognize an independent action for conspiracy. *See Churruca v. Miami Jai Alai, Inc.*, 353 So.2d 547, 550 (Fla.1977); *Hoch v. Rissman, Weisberg, Barrett*, 742 So.2d 451, 460 (Fla. 5th DCA 1999).[19] Under Florida law, a civil conspiracy is derived from the underlying claim that forms the basis of the

---

18. During oral argument, the parties conceded, for purposes of summary judgment, that the City–UM contract was legal.

19. In *Churruca*, the Florida Supreme Court recognized an exception to this rule if the plaintiff "can show some peculiar power of coercion possessed by the conspirators by virtue of their combination." *Id.* at 550. The plaintiffs have not made such an allegation in this case, nor have they attempted to introduce evidence of the power to coerce. As a

conspiracy. *See Czarnecki v. Roller,* 726 F.Supp. 832, 840 (S.D.Fla.1989) (discussing and applying Florida law). As a Florida court has stated, the "gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff." *Czarnecki* (quoting *Buckner v. Lower Florida Keys Hosp. Dist.,* 403 So.2d 1025, 1027 (Fla. 3d DCA 1981)). Pursuant to this rule, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. *See Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1217 (11th Cir. 1999) (applying Florida law); *Palmer v. Gotta Have It Golf Collectibles, Inc.,* 106 F.Supp.2d 1289, 1302–03 (S.D.Fla.2000); *Czarnecki,* 726 F.Supp. at 840; *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.,* 361 So.2d 769, 772 (Fla. 4th DCA 1978).

■ In this case, the plaintiffs' conspiracy claims are based on the allegations of count I, which constitute the negligent misrepresentation claim. As discussed in section I, above, the plaintiffs have not introduced any fact to support their misrepresentation claim, and the defendants are entitled to summary judgment on that count. Because the claim underlying the plaintiffs' conspiracy count has failed, and the plaintiffs have not asserted any other unlawful action in support of their conspiracy count, count III also must fail. *See Palmer,* 106 F.Supp.2d at 1303 (granting summary judgment for defendant on plaintiff's conspiracy claim where there were no genuine issues of material fact as to underlying tortuous interference claim); *Ovadia v. Bloom,* 756 So.2d 137, 140 (Fla. 3d DCA 2000) (affirming summary judgment for defendant on conspiracy claim where summary judgment was granted on

result, the exception discussed in *Churruca* is

underlying claims); *Hoon v. Pate Constr. Co.,* 607 So.2d 423, 430 (Fla. 4th DCA 1992) ("Since we have determined that a cause of action for defamation, a necessary predicate to a cause of action for conspiracy to defame, has not been alleged or proven, an action for conspiracy to defame predicated on such defamation must also fail."); *Balcor Property Mgmt., Inc. v. Ahronovitz,* 634 So.2d 277, 280 (Fla. 4th DCA 1994) (holding that plaintiff could not prove conspiracy claim where he could not sustain underlying claim for civil theft). *Compare Unkel v. Liggett Group, Inc.,* 172 F.R.D. 474, 477 (M.D.Fla.1997) (denying motion to dismiss conspiracy claim where claim for underlying fraud was stated). Accordingly, UM is entitled to summary judgment on the plaintiffs' conspiracy claim.

## III. Count VI (second): Florida RICO

Count VI (second) of the plaintiffs' fifth amended complaint is against UM for violation of Florida's RICO statute, Fla. Stat. §§ 895.01 *et seq.* Florida's RICO statute makes it "unlawful for any person employed by, or associated with any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." Fla. Stat. § 895.03(3). A pattern of racketeering activity is defined by statute as:

> Engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effec-

inapplicable.

tive date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct.

Fla. Stat. § 895.02(4). Because the RICO statute is patterned after the federal RICO statute, Florida courts look to federal courts for guidance in construing the state's RICO statute. *See All Care Nursing Svc., Inc. v. High Tech Staffing Svcs., Inc.,* 135 F.3d 740, 745 (11th Cir.1998); *Mese v. State,* 824 So.2d 908 (Fla. 3d DCA 2002) (citing *Gross v. State,* 765 So.2d 39, 42 (Fla.2000)); *Banderas v. Banco Central del Ecuador,* 461 So.2d 265, 269 (Fla. 3d DCA 1985).

■ In general, racketeering activity is the violation of any of the criminal laws enumerated in the RICO statute. *See* Fla. Stat. § 895.02(1). According to the plaintiffs, the illegal conduct engaged in by the defendants in this case, or the predicate acts constituting the racketeering, was the defendants' alleged violation of the federal mail and wire fraud statutes.[20] Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. *See Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1360 (11th Cir.2002); *Pelletier v. Zweifel,* 921 F.2d 1465, 1498 (11th Cir. 1991). The plaintiffs claim that the defendants used radio communications and the postal service to transmit information containing various fraudulent communications about the plaintiffs' status as City officers.

■ In their motion for summary judgment, the defendants argue that the plaintiffs lack standing to bring their RICO claim based upon the predicate acts of mail and wire fraud because the plaintiffs did not rely upon the alleged misrepresentations made by the defendants through the radios and mail.[21] In order to have standing to bring a RICO claim, a plaintiff must show a direct causal connection between his or her injury and the commission of the predicate acts. *See Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1360 (11th Cir. 2002); *Pelletier v. Zweifel,* 921 F.2d 1465, 1497 (11th Cir.1991). That is, in order to establish RICO fraud, courts require private plaintiffs to show that the federal fraud statute was violated and that they have suffered injury as a result of the violation. *See Byrne v. Nezhat,* 261 F.3d

---

**20.** The plaintiffs' complaint does not specifically state that the defendants have violated the federal mail and wire fraud laws. It simply states that the acts comprising the defendants' scheme involved "the use of the mails and technology to commit fraud...." Pl. 5th Am. Compl. at ¶ 61. The enforcement of the mail and wire fraud statutes is preempted by the federal government, but Florida's RICO statute uses these federal offenses to make up the state charge or claim. *See Rogers v. State,* 487 So.2d 57, 58 (Fla. 3d DCA 1986) (holding that enforcement of state statute in case involving violation of federal mail fraud statutes was constitutional). For purposes of this order, the court construes the allegations of the complaint as attempting to state a claim for federal mail and wire fraud.

**21.** As discussed in section I, above, there are no genuine issues of material fact to preclude a finding that the defendants have not engaged in any fraud or have made any misrepresentations. This reason alone is a sufficient basis to grant the defendants summary judgment on the plaintiffs' RICO claims, for, if the defendants have engaged in no fraud, they have engaged in no wrongdoing for RICO purposes. The discussion on standing assumes that this is not true. That is, it proceeds to analyze this case under the assumption that the defendants have engaged in fraud and have made misrepresentations.

1075, 1110 (11th Cir.2001).[22] In *Byrne*, the Eleventh Circuit stated that the fraud statutes have been:

> "interpreted by the Supreme Court and lower courts to include a proximate cause requirement—the plaintiff's injury must have been proximately caused by the commission of predicate acts" .... This restrictive view of the proximate cause requirement means that a plaintiff has standing to sue only if his injury flowed directly from the commission of the predicate acts.... *As such, a plaintiff lacks standing to assert, as the basis for mail fraud, misrepresentations directed toward another person or entity.*

*Id.* at 1110 (emphasis added) (citations omitted); *see also id.* at 1111, 1112 (holding that plaintiff lacked standing to assert RICO claim for mail fraud based on misrepresentations made to third parties); *Sikes*, 281 F.3d at 1360–61 (stating that plaintiff bringing civil RICO case based upon mail or wire fraud must show he relied to his detriment on misrepresentations made in furtherance of that scheme).

In light of the principle clearly announced and reiterated throughout *Byrne*, the court finds that the defendants correctly have stated the rule regarding reliance in RICO cases predicated upon mail and wire fraud. *See Byrne*, 261 F.3d at 1110 n. 73 (stating that Eleventh Circuit takes a "restrictive view" of proximate cause and reliance requirement). *Byrne's* rule, that a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties, is consistent with the precedent of this circuit. For example, in *Johnson Enterprises of Jacksonville, Inc. v. FPL Group*, 162 F.3d 1290 (11th Cir.1998), the Eleventh Circuit held that a plaintiff could not assert a RICO claim based on fraudulent misrepresentations made to third parties. In discussing the standing requirement, the court assumed that the plaintiff had been injured as a result of the defendant's statements to the third parties, but it held that the plaintiff "did not suffer a *direct* injury, proximately caused by those acts, as required under [18 U.S.C. § ] 1964(c)". *Id.* at 1318. The court quoted with approval from *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991), a prior Eleventh Circuit case that stated "the plaintiff ... must have relied to his detriment on misrepresentations made in furtherance" of the scheme to defraud. *Johnson Enter.*, 162 F.3d at 1318 (quoting *Pelletier*, 921 F.2d at 1499–1500). The Eleventh Circuit concluded in *Johnson Enterprises*, "Because the misrepresentations the defendants are said to have made were directed to the franchising authorities [the third parties], not [to the plaintiff], [the plaintiff] lacks standing under section 1964(c) to prosecute a claim based on such misrepresentations." *Id.*, 162 F.3d at 1318; *see also Israel Travel Advisory Svc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir.1995) (stating that plaintiff could not recover under RICO on basis of underlying mail fraud where fraud was committed upon customers, not plaintiff); *Fla. Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 165 F.Supp.2d 1345, 1351–52 (S.D.Fla. 2001) (dismissing RICO claim upon observing, "[I]n order to establish proximate cau-

---

**22.** Although *Byrne* involved the federal mail fraud statute, the causation analysis employed by the Eleventh Circuit in that case has been extended to other fraud statutes. *See Sikes*, 281 F.3d at 1360–61 (stating that causation requirement applies to both mail and wire fraud); *Pelletier*, 921 F.2d at 1498 ("The elements of mail and wire fraud are identical.") (citations omitted).

sation in a civil RICO action predicated on fraud, the purported victim must make the same showing of reasonable reliance that is required for establishing injury from common law fraud."); *Banco Latino Int'l v. Gomez Lopez*, 95 F.Supp.2d 1327, 1334 (S.D.Fla.2000) (stating that, in a civil RICO case, plaintiff alleging fraud as predicate act must show he relied to his detriment on misrepresentations made in furtherance of scheme).

■ In support of their motion for summary judgment, the defendants in this case argue that the plaintiffs lack standing to assert RICO claims because they cannot point to any radio or mail communications containing fraudulent misrepresentations on which they have relied. A review of the record fully supports the defendants' position. Garcia–Montes, Allen [23], Silva, Allocco [24], and Fernandez [25] have admitted that they are not aware of any fraudulent actions or statements specifically directed at them by the defendants by way of mail, phone, or wire that would support their RICO claims. (Garcia–Montes Depo. at 457–59; Allen Depo. at 169, 178–86; Fernandez Depo. at 532; Allocco Depo. at 476–96). Under *Byrne*, the plaintiffs' RICO claims, which are based on mail and wire fraud, must fail because, if no misrepresentations were directed to the plaintiffs, they did not suffer injury as a result of the defendants' actions, as they could not have "reasonably relied" on communications they did not receive. *See id.*, 261 F.3d at 1109–10; *Pelletier*, 921 F.2d at 1499–1500.

Such a conclusion follows the Eleventh Circuit's holding in *Beck v. Prupis*, 162 F.3d 1090 (11th Cir.1998), where the court affirmed summary judgment on the plaintiff's RICO claims. *Id.* at 1097. According to the Eleventh Circuit, the plaintiff "failed to demonstrate proximate cause ... [where he] presented no evidence that he actually saw, let alone relied upon, any false financial statements prior to making his financial decisions." *Id.* At least one Florida appellate court has applied *Beck's* reasoning to state RICO claims. In *TransPetrol Ltd. v. Radulovic*, 764 So.2d 878 (Fla. 4th DCA 2000), the court dismissed the plaintiff's RICO action upon finding that, like the plaintiff in *Beck*, the plaintiff did not allege that he had relied on false statements, saw any documents it contended were false or fraudulent, and could not show that the documents were created by the defendant to induce him to take any action. *See TransPetrol*, 764 So.2d at 881.

In their fifth amended complaint, the plaintiffs in this case include a chart of items they claim were used by the defendants to perpetrate mail and wire fraud. *See* 5th Am. Compl. at ¶ 62. Assuming that the record contains evidence of the existence of all of these items, none provides a valid basis for the plaintiffs'

---

**23.** The only false statement that Allen contends was communicated to him was by UMPSD Chief Ivy, who told allegedly told him that UM and City pay was "in parity", but this communication was made to Allen by Ivy in person. If the statement was made in person, it could not have been transmitted to Allen by mail or wire.

**24.** Allocco admits that most communications by UM to him were made in person or through his UM mail slot. Allocco only recalls receiving updates of his UM application

process by mail and one of his IA notices by facsimile, but he has not identified any fraudulent statements in these documents.

**25.** The only exception to this is Fernandez's statement that he "thinks" that the 97/98 Safety and Security Brochure was mailed to him, but Fernandez has not shown that this brochure contained fraudulent statements nor that it actually was mailed to him.

RICO claim. One column of the complaint's chart identifies the recipient of the letters or communications. Of the thirty-one items identified by the plaintiffs, twenty-four were sent to persons other than the plaintiffs. Because these items were addressed to third parties, the plaintiffs cannot base their RICO claims on this evidence. The remaining seven items arguably were directed to the plaintiffs, but none of these is actionable because the items did not contain fraudulent statements. Additionally, there is no evidence that an undated recruitment bulletin issued to potential job applicants; a memorandum from February 8, 1994, by Christensen to all police officers; an October 8, 2000, memorandum by Gary Broughman to all officers; an October 23, 1996, notice memorandum to all members of the UM community; and a January 29, 1997, memorandum to all sergeants and OICs were sent by the mail, rather than posted in a bulletin board or placed in a UM mail slot. It is not even clear that any of these actually were received by the plaintiffs. An "invoice-mail" sent on April 12, 1998, to all UM police is not actionable because it was sent by Florida Radio Rental, Inc., who is not a party to this case.

Finally, Allocco alleges that several mailings and telephone calls made by CGPD recruitment between January and September of 1993 are evidence of RICO violations, and he describes these items as follows: "UM's use of CGPD's letterhead stationary for purposes of hiring. Use of telephones by CGPD personnel to respond to questions and of meetings. Use of CGPD no postage necessary stamp." It is not clear why any of these items are fraudulent, nor has Allocco elaborated on these items in connection with the defendants' summary judgment motions. As such, Al-

locco cannot use these items as a basis of his RICO claims.

In summary, under applicable Eleventh Circuit law, a plaintiff must show that he or she has relied on the communications constituting the RICO violations. In this case, the evidence shows that the mail or wire fraud alleged by the plaintiffs was directed to third parties or never was received by the plaintiffs. Because the plaintiffs cannot satisfy the causation requirement under these circumstances, their RICO claim must fail. Accordingly, the defendants are entitled to summary judgment on Count IV (second) of the plaintiffs' fifth amended complaint.

## IV. Counts II, VI (first), VII, VIII, and IX: Constitutional and Whistleblower Claims

The remaining counts of the fifth amended complaint are asserted only by Allocco and Fernandez against the defendants. These claims are: count II, retaliation in violation of the First Amendment (against the City); count VI (first), violation of Florida's private whistleblower statute, Fla. Stat. §§ 448.102 et seq. (against UM); count VII, violation of Fourteenth Amendment due process rights (against the City); count VIII, violation of Florida's public whistleblower statute, Fla. Stat. §§ 112.3187 (against UM and the City); and count IX, violation of 42 U.S.C. § 1983 (against the City). The defendants correctly argue that they are entitled to summary judgment on all of these claims.

### A. The State Whistleblower Claims

#### 1. Count VIII Is Administratively and Time–Barred

The defendants are entitled to summary judgment on count VIII, which is

for violation of Florida's public whistle-blower statute, Fla. Stat. § 112.3187, because that claim is time-barred. Additionally, the plaintiffs have not shown that they have exhausted their administrative state remedies. Section 112.3187 prevents state agencies from taking retaliatory action against individuals who disclose information to an appropriate agency "alleging improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty on the party of an agency, public officer, or employee". Fla. Stat. § 112.3187(2). In order to successfully bring a whistleblower claim in court under this provision, a plaintiff first must exhaust "all available contractual or administrative remedies". Fla. Stat. § 112.3187(8). The plaintiffs' complaint does not allege that they have satisfied this requirement, nor have they introduced any evidence to show their compliance. Accordingly, they cannot seek relief under Fla. Stat. § 112.3187. *See Fairbanks v. City of Bradenton Beach,* 733 F.Supp. 1447, 1449 (M.D.Fla.1989) (dismissing whistleblower claim where complaint did not address exhaustion requirement); *Dinehart v. Town of Palm Beach,* 728 So.2d 360, 362 (Fla. 4th DCA 1999) (stating that public employees cannot bring civil action until they exhaust administrative remedies, or if local governmental authority has not adopted an administrative procedure).

■ Even if the plaintiffs had exhausted their administrative remedies, count VIII still must be dismissed as untimely. Section 112.3187(8) of the Florida Statutes requires that a civil action be brought "within 180 days after the action prohibited by this section". The latest alleged adverse action alleged by Allocco was his termination on January 20, 1999. He did not raise his whistleblower claim until August 5, 1999, which was 197 days after his termination. Similarly, the latest adverse action alleged by Fernandez was his termination on February 1, 1999, but he did not raise his whistleblower claim until August 5, 1999, 185 days after the occurrence of "the action prohibited by" Fla. Stat. § 112.3187.

The plaintiffs argue that the period for bringing their suit under Fla. Stat. § 112.3187 did not begin to run until the date that the plaintiffs learned that they had been discharged for illegitimate reasons, not from the date of their termination. In support of this position, the plaintiffs rely on *Harris v. District Board of Trustees of Polk Community College,* 9 F.Supp.2d 1319 (M.D.Fla.1998), where the court held that the 180–day period began to run when the terminated plaintiffs first learned that they may have been discharged for non-whistleblowing activities. *Id.* at 1327.

This court declines to follow *Harris* to the extent that it holds that the 180–day limitations period does not begin until the plaintiff discovers the retaliatory nature of the alleged adverse employment action. *Harris'* interpretation of Fla. Stat. § 112.3187(8)(c) is contrary to the language of the act itself, which unambiguously requires that suit be filed "within 180 days after the action prohibited by this section". The statute does not suggest any other starting point. If the Florida Legislature had intended a different result, it would have employed different language. For example, under Florida's private whistleblower act, the other provision under which the plaintiffs are proceeding, the Legislature specifically states that suit must be filed "within 2 years *after discovering* that the alleged retaliatory person-

nel action was taken, or within 4 years *after the personnel action was taken,* whichever is earlier." Fla. Stat. § 448.103(1)(a) (emphasis added). The use of both terms in the private whistleblower act shows that the Legislature intended "after discovering" to mean something different than "after the action". Because the latter phrase is the only one that appears in Fla. Stat. § 112.3187(8)(c), the court construes the 180–day period as beginning to run upon the occurrence of the adverse action. *See also Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (holding that 180–day statute of limitations provision for filing EEOC charge under Title VII commenced on day plaintiff was denied tenure, "not upon the time at which the consequences of the acts became most painful") (citation omitted). It follows that, under Florida whistleblower law, the date of discovery of the adverse action is relevant only for private sector claims. For these reasons, the plaintiffs' public sector claim, which was filed beyond the 180–day period, is untimely.

### 2. Standard for Whistleblower Claims Under Florida Law

Florida's private (Fla. Stat. § 448.101 et seq.) and public-sector (Fla.Stat. § 112.3187) whistleblower statutes are similar in that both prohibit a covered employer from taking adverse employment action against an employee for engaging in protected activity. *See Arrow Air, Inc. v. Walsh,* 645 So.2d 422, 424 (Fla.1994) (stating that both statutes serve similar purpose). They differ in that the private sector statute [26] addresses the reporting of illegal action by an employer, whereas the public sector statute [27] addresses illegal action by a public employee. *See Sussan v. Nova Southeastern Univ.,* 723 So.2d 933, 934 (Fla. 4th DCA 1999) (explaining differences).

In analyzing Florida private and public sector whistleblower actions, courts apply the same standard that is used for Title VII retaliation claims. *See Sierminski v. Transouth Fin. Corp.,* 216 F.3d 945, 950 (11th Cir.2000) (analyzing Florida private sector claim under Title VII retaliation standard); *Rice–Lamar v. City of Ft. Lauderdale,* No. 4D01–1934, 2002 WL 985439 *6 (Fla. 4th DCA May 15, 2002) (analyzing Florida public sector claim under Title VII retaliation standard). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a statutorily-protected activity; (2) he suffered an adverse employment action; and (3) there is a causal relation between the two events. *See Rice–Lamar* at *6 (citing *Sierminiski*); *Padron v. BellSouth Tele., Inc.,* 196 F.Supp.2d 1250, 1255 (S.D.Fla.2002) (applying Title VII retaliation standard to Florida private whistleblower action and listing elements of prima facie case). Once the prima facie case is established, the

---

**26.** Section 448.102 of the Florida Statutes, which is referred to in this order as the private sector whistleblower statute, prohibits retaliatory personnel action against an employee because the employee has "[d]isclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation."

**27.** Section 112.3187(2) of the Florida Statutes, which is referred to in this order as the public sector whistleblower statute, prohibits retaliatory action against an employee "who reports to an appropriate agency violations of law on the part of a public employer or independent contractor".

employer must proffer a legitimate, non-retaliatory reason for the adverse employment action. *See id.; see also Olmsted v. Taco Bell,* 141 F.3d 1457, 1460 (11th Cir. 1998). The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for the prohibited, retaliatory conduct. *See Rice–Lamar,* at *4; *Olmsted,* 141 F.3d at 1460.

### 3. The Plaintiffs Cannot Establish Causation on the Whistleblower Claims

Even if the plaintiffs' public sector whistleblower claim under Fla. Stat. § 112.3187 were not administratively and time-barred, the defendants still would be entitled to summary judgment on count VIII because the plaintiffs cannot satisfy the third requirement of their prima facie case. That is, they have not shown that a causal link exists between their allegedly protected activities and the adverse employment action. Count VI (first), the private sector whistleblower claim, is barred for the same reason.[28]

Allocco's alleged whistleblower activities include allegations that UM and the City violated the Clery Act, that the City made misrepresentations to CALEA in connection with the City's pursuit of accreditation, that UM was housing confidential records, and that UMPSD's radio system was problematic. Fernandez's activities relate to his allegations that UM and the City violated the Clery Act and that the

City made misrepresentations to the CALEA. The only adverse employment action that is relevant to this case is the plaintiffs' termination.

■■■■ **Clery Act:** The plaintiffs have not introduced any evidence that would lead a fact finder to conclude that their alleged whistleblower activities were related to their termination. Allocco did not complain about Clery Act violations to UM, the defendant who took the adverse action, until he wrote letters on January 29, 1999, about the defendants' alleged violations of the act. The problem with Allocco's argument is that, in order to show a causal connection between the protected activity and the adverse action, Allocco must show that the defendants were aware of the protected conduct *before* the adverse action was taken. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993) ("At a minimum, a plaintiff must generally establish that the employee was actually aware of the protected expression at the time it took the adverse employment action."). Allocco's termination occurred on January 20, 1999. Because Allocco made his statements about the Clery Act on January 29, 1999, nine days after he was terminated, Allocco cannot show that the statements resulted in an adverse employment action.

It is not clear from the record whether Fernandez ever made any written disclosures about Clery Act violations to anyone at UM, but, if he did, this would have occurred in 1997, following his suspension.

---

28. This discussion assumes, without deciding, that the plaintiffs can satisfy the first and second requirements of their prima facie case. It should be noted, however, that it is highly unlikely that the plaintiffs can show that they have engaged in activities that are protected under either statute. This is particularly true as it relates to the plaintiffs' pri-

vate sector whistleblower claims, for Fla. Stat. § 448.102 requires that the disclosure or threatened disclosure that is made by the plaintiff be "under oath, in writing". Most of the plaintiffs' allegedly protected activities were not in writing, and those that were written, were not made under oath.

(Fernandez Depo. at 867–68). Assuming that Fernandez did engage in protected activity at that time, he has not shown that his statements regarding the Clery Act were related to his termination because these statements were made two years prior to his termination. *See Wascura v. City of South Miami,* 257 F.3d 1238, 1247 (11th Cir.2001) (finding that, without more, three and one-half months between protected activity and adverse action is too long to establish causation). Additionally, the statements were not related to the 1997 suspension because, if they were made, they occurred after the suspension, not before.

■ **Misrepresentations to CALEA:** Allocco cannot show any causal connection between his complaints about the City's alleged misrepresentation to CALEA that UM is a separate agency. Allocco first wrote an e-mail to CALEA on March 11, 1998. He then sent another e-mail to CALEA on April 29, 1998, and asked CALEA not to forward it to CALEA. Allocco has no evidence that anyone from the City or UM was aware of any of these communications, yet, in order to show causation, he must establish that the defendant was aware of the protected activity. *See Goldsmith,* 996 F.2d at 1163.

Allocco next mentioned his complaint to CALEA in his October 20, 1998, letter to City Attorney Hernandez. Allocco raised his allegation that Chief Skinner misrepresented to CALEA that UM is a separate agency in his December 15, 1998, letter to City Employee Relations Director Katz. Allocco also sent a letter on January 13,

1999, to CALEA. Allocco has no evidence that anyone from the City or UM ever was made aware of these communications. Moreover, he has not shown how they may have been related to his termination. This is particularly true of the letter dated January of 1999 because that letter had eleven signatories, and, of these eleven, six continue to work for UM.

The only communication made by Fernandez to the CALEA was his signature on the January 1999 letter. Like Allocco, Fernandez cannot establish a causal connection between this letter and his termination because there is no evidence that the defendants were aware of this letter, and six of the signatories continue to work for UM.

■ **Housing of Confidential Records:** Allocco claims that his complaint about UM housing confidential records was a protected activity. As with his other claims, Allocco cannot establish a causal link. Allocco raised this issue with former UMPSD Director, Eric Shoemaker, but Director Shoemaker left UM on July 1, 1997. It does not appear from the record that anyone else was made aware of Allocco's complaint. Because Allocco was not terminated until January of 1999, and Director Shoemaker no longer was working for UMPSD when the adverse action occurred, Allocco has failed to show how this complaint is related to his termination.

■ **Radio System:** In April of 1998, Allocco wrote a police report complaining about the ineffectiveness of UM's radio system.[29] Allocco originally complained

---

29. Allocco was suspended for writing this report, so there is an arguable causal connection between the writing of the report and his suspension. Assuming that the report is a

protected activity and his suspension is actionable, Allocco's claim still must fail because the defendants have provided a valid, nonpretextual reason for Allocco's suspen-

about the radio equipment in 1995, and he also raised the issue in his petition in October of 1996. Allocco has not show that his complaints about UM's radio system is related to his termination because these complaints occurred significantly before the adverse action was taken. Additionally, five other officers who signed the October 1996 petition, including plaintiff Garcia–Montes, continue to work for UM. Accordingly, Allocco's whistleblower claims fail to the extent they are premised on the radio reports.

### 5. UM Had a Legitimate, Non–Pretextual Reason for Terminating the Plaintiffs

If a plaintiff successfully establishes a prima facie case, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action. *See Olmsted v. Taco Bell,* 141 F.3d 1457, 1460 (11th Cir.1998). The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for the prohibited, retaliatory conduct. *See Olmsted,* 141 F.3d at 1460. Assuming that the plaintiffs in this case could establish a prima facie case of retaliation under their whistleblower claims, the defendants still would be entitled to summary judgment because they have provided a legitimate, nonretaliatory reason for the plaintiffs' termination, and the plaintiffs have not shown that the reason is pretextual.

As outlined in detail in the undisputed facts, in the first week of January of 1999, UMPSD Director Christensen learned that, on December 30, 1998, Allocco and Fernandez had been at the Junior Orange Bowl Parade on bicycles, several miles from campus. Allocco's and Fernandez's presence at the parade was confirmed in writing by other officers. By going to the parade on bicycles together, the plaintiffs had violated UMPSD Captain Clusman's recent directive prohibiting UM bicycle patrol officers from riding together and prohibiting more than one bicycle patrol officer per shift.

Christensen met with Allocco on January 19, 1999, and attempted to ask him questions regarding the incident, but Allocco refused to answer the questions, telling Christensen that he did not want to discuss the matter if an IA investigation was occurring. Christensen told Allocco there would be no IA investigation by the City,[30] and he advised Allocco that his refusal to cooperate could be considered insubordination. The next day, Christensen requested Allocco to meet with him again to discuss the events of December 30, 1999, and Allocco again refused. As a result, Christensen terminated him for insubordination. (Allocco Depo. at 389, Ex. 437; Christensen Decl. at ¶ 50).

Fernandez was terminated for the same reason. Christensen gave Fernandez three opportunities to explain his actions

---

sion. According to UMPSD Captain Christensen, Allocco was suspended for not following proper report writing procedure and for his lack of judgment in preparing and submitting the report. (Allocco Depo. at 386, Ex. 434). The absence of a pretext is apparent, as Allocco had raised the radio issue several times since 1995, and five other officers who signed a 1996 petition complaining about the radio system continue to work for UM.

**30.** In response to the defendants' summary judgment motion, the plaintiffs incorrectly argue that the City initiated an IA investigation into their activities. The evidence shows only that CGPD Skinner made a telephone call to UMPSD Director Christensen to inform him that Allocco and Fernandez were seen together. It is undisputed that the City ceased to become involved in the investigation at that point.

on December 30, 1998, and Fernandez refused to cooperate on each occasion. The first time, January 19, 1999, Fernandez refused to answer any questions, claiming that he could not because there was an ongoing City IA into the matter. Christensen advised Fernandez that his refusal to cooperate would be viewed as insubordination. Fernandez met with Christensen again on January 20, 1999, this time claiming a complete loss of memory as to the events of December 30, 19998. On January 22, 1999, Christensen gave Fernandez a third opportunity to explain the situation, but Fernandez gave only vague and sketchy answers. As a result, UM also terminated Fernandez for his insubordination in refusing to cooperate with the investigation. (Fernandez Depo. at 677, 1019).

■ The plaintiffs' blatant refusal to cooperate in UM's investigation and provide information requested by their commander directly contravened the need for the UMPSD to maintain order, discipline, and loyalty amongst officers. *Cf. Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1293–94 (11th Cir.2000) (stating that officer's speech would not be protected where he refused to disclose information requested by commanding officer). Furthermore, three principles are particularly applicable to this situation. First, a termination based on a good faith belief of misconduct is legitimate, even if it is later determined that no misconduct occurred. *See E.E.O.C. v. Total Sys. Svcs., Inc.,* 221 F.3d 1171, 1176–77 (11th Cir.2000) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.") (quoting *Damon v. Fleming Super. of Fla.,* 196 F.3d 1354, 1363 n. 3 (11th Cir.1999); *Elrod v.*

*Sears Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991). Under this tenet, even if the plaintiffs are correct that they violated no UM rule by riding together at the parade, their termination is not actionable because UM was proceeding under the belief that there was a standing, valid order prohibiting UM bicycle patrol officers from riding together. Second, a court will not sit as a super-personnel department and second-guess the business judgment of an employer's termination decisions. *See Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.2000) (stating that court will not second-guess employer's business judgment where proffered reason is one that might motivate a reasonable employer); *Alexander v. Fulton Cty., Ga.,* 207 F.3d 1303, 1341 (11th Cir.2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions...."). Third, police departments have an unquestionable need for a high degree of order, discipline, and loyalty among their officers. *See Stanley v. City of Dalton,* 219 F.3d 1280, 1289 (11th Cir.2000) (stating that police department has strong interest in maintaining "close working relationships, mutual respect, discipline, and trust"); *Hansen v. Soldenwagner,* 19 F.3d 573, 577 (11th Cir.1994) (stating that police department, as quasi-military organization, has special concern with efficiency among ranks).

The undisputed facts show that the plaintiffs' insubordination threatened that order, discipline, and loyalty, and the plaintiffs have not shown how their termination for insubordination could have been pretextual in light of the undisputed fact that they repeatedly refused to respond to reasonable questioning related to an internal investigation of their activities. As stated by the Eleventh Circuit, this court cannot second-guess the executive deci-

sions of an employer, particularly when that employer is a police department trying to maintain order and discipline. Because the plaintiffs have failed to present any evidence to undermine UM's reason for terminating the plaintiffs, the defendants are entitled to summary judgment on counts VI (first) and VIII of the fifth amended complaint.

### B. Counts II, VII, and IX: Retaliation, Due Process, and § 1983 Claims

Counts II, VII, and IX were filed by Allocco and Fernandez against the City for constitutional violations.[31] In these claims, the plaintiffs are arguing that they were terminated in retaliation for various complaints that they made to third parties, the City, and UM about the defendants' conduct and the way in which the police departments were run. Essential to an examination of the constitutional claims is the fact that UM, and not the City, terminated the plaintiffs. During oral argument, the parties were asked to address whether the City was involved in the plaintiffs' termination. It is apparent that that decision was made solely by UM as a result of the events at the Orange Bowl Parade on December 30, 1998. Although a supervising City officer alerted UM to the plaintiffs' presence at the parade, UM conducted the investigation and decided to terminate the plaintiffs. There is no evidence that the City was consulted or participated in the investigation or ultimate decision to terminate the plaintiffs. Moreover, the plaintiffs never sought review of

the adverse action from the City. These points are significant because the plaintiffs are attempting to hold the City liable for an employment decision that was made entirely by UM.

It is against this backdrop that the City persuasively argues that it cannot be held liable for violating the First Amendment, the due process clause of the Fourteenth Amendment, or 42 U.S.C. § 1983 because it never took an adverse employment action. Rather, the action about which the plaintiffs complain was taken by UM, a private entity, and no constitutional claims have been brought, or can be brought, against it. Alternatively, the defendants also correctly argue that the plaintiffs have not introduced sufficient evidence to raise genuine issues of material fact as to the elements of each of their constitutional claims. As explained more fully below, the defendants are entitled to summary judgment on all of these grounds.

#### 1. The Plaintiffs' Terminations Do Not Involve State Action

Allocco and Fernandez allege, pursuant to 42 U.S.C. § 1983, that the City violated their constitutional rights to free speech and due process when UM terminated their employment.[32] As a threshold to liability under § 1983 for an alleged constitutional violation, a plaintiff must show that the conduct at issue resulted from state action. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ("Most rights secured by the Constitution are pro-

---

**31.** UM cannot be held liable for these constitutional violations because it is not a government entity.

**32.** Section 1983 itself provides no substantive rights. It only provides a remedy for viola-

tions of the United States Constitution or a federal statute. *See Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 618, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

tected only against infringement by governments."); *Blackard v. Memphis Area Med. Ctr. for Women, Inc.*, 262 F.3d 568, 579 (6th Cir.2001) (stating that state action, as opposed to private action, is required in context of constitutional violations); *Nat'l Broad. Co. v. Commun. Workers of Am.*, 860 F.2d 1022, 1024 (11th Cir.1988) ("The Fourteenth Amendment, and, through it, the First and Fifth Amendments, do not apply to private parties unless those parties are engaged in activity deemed to be 'state action'."). If a plaintiff shows conduct resulting from state action, he then must prove that the state actor violated a constitutional or federal statutory right. *See Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000). Only after a plaintiff has proven both state action and a violation of federal law can a court consider whether the plaintiff has satisfied the legal requirements of § 1983.

■■■ Under this framework, the first step of the inquiry is whether the conduct at issue resulted from state action, or whether "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744. To show that conduct is "fairly attributable" to the state, a plaintiff must prove that: (1) the alleged constitutional deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible" and (2) the party charged with the deprivation is a state actor. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Patrick v. Floyd*

*Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000) (quoting *Sullivan* ).[33] Careful adherence to the state action requirement "avoids imposing·on the State, its agencies or officials, responsibility for conduct for which they cannot be fairly blamed." *Lugar*, 457 U.S. at 936, 102 S.Ct. 2744. "Only in rare circumstances can a private party be viewed as a[s]tate actor for section 1983 purposes." *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir.2001). Because the plaintiffs in this case cannot prove either step, the City is not responsible for UM's decision to terminate the plaintiffs.

### a. Step 1: UM Did Not Act Pursuant to City Rule or Regulation

■■■ There simply is no evidence in the record to satisfy the first step of the analysis—that UM, in terminating the plaintiffs, was exercising a right, privilege, or rule of conduct created by the state. *See Sullivan*, 526 U.S. at 50, 119 S.Ct. 977; *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744. The plaintiffs have not presented a City rule or regulation pursuant to which UM suspended or terminated their employment. In fact, the agreement between the City and UM specifically provides the UM "Police Officers will not be subject to Trial Board hearings and will instead be disciplined by the University". Def. Ex. 22. Because the plaintiffs were disciplined pursuant to UM policy, and the City did not play a role in their discipline, they could not have been disciplined in response to a City regulation. As a result, the plaintiffs cannot show that UM's conduct was "fairly attributable" to the City, and their constitutional claims must fail.

### b. Step 2: UM Was Not a State Actor

Notwithstanding the plaintiffs' failure to satisfy the first step of the analysis, the

**33.** The plaintiffs do not dispute that this inquiry governs the analysis of their constitutional claims.

court will proceed to analyze the second step, which the plaintiffs also fail to satisfy. The second step requires the plaintiffs to show that UM can "fairly be said to be a state actor". *Sullivan,* 526 U.S. at 50, 119 S.Ct. 977. The Supreme Court has devised three tests that a plaintiff may employ in order to satisfy this element: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test. *Sullivan,* 526 U.S. at 51, 119 S.Ct. 977; *Rayburn,* 241 F.3d at 1347. In making this determination, it is imperative to identify the "specific conduct of which the plaintiff complains." *Sullivan,* 526 U.S. at 51, 119 S.Ct. 977.

The specific conduct complained of by the plaintiffs in this case is that the City participated in or acquiesced in UM's decision to terminate their employment. Thus, the issue is whether UM's personnel decisions may be fairly attributable to the City so as to subject the City to § 1983 liability. Because the plaintiffs do not satisfy any of the three tests devised by the Supreme Court for step two of the state actor analysis, the defendants are entitled to summary judgment.

■■■■■■ **Public Function Test:** "The public function test for state action has been limited strictly, and covers only private actors performing functions 'traditionally the exclusive prerogative of the state." *Nat'l Broad. Co.,* 860 F.2d at 1026. In *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Supreme Court cautioned that simply because an entity generally performs a public function is not sufficient to prove state action. *Id.* at 353, 95 S.Ct. 449. Instead, state action may be found only where the plaintiff is alleging that the private entity violated his constitutional rights while exercising "some power dele-

gated to it by the State which is traditionally associated with sovereignty." *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (citing *Jackson* and stating that "our holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' We have held that the question is whether the function performed has been traditionally the exclusive prerogative of the State.").

■■■■ Here, it is clear that UM serves a public function, for it serves as a police force on campus. The Supreme Court instructs, however, that a court must ask whether the public function performed by UM violated the plaintiffs' constitutional rights. The alleged unconstitutional conduct in this case was the plaintiffs' termination, but that act did not result from UM's police conduct, but from its conduct as an employer. This case is similar to *Campbell v. Civil Air Patrol,* 131 F.Supp.2d 1303 (M.D.Ala.2001), where the court held that the plaintiffs did not satisfy the public function test because the alleged unconstitutional act was unrelated to the private entity's public function. *Id.* at 1312. The plaintiffs in *Campbell* were employees of the Civil Air Patrol ("CAP"), a federally-chartered private corporation that performed noncombat missions for the Air Force. *Id.* at 1306–09. The plaintiffs sued CAP and the Air Force after they were terminated without notice and an opportunity for a hearing. The court held that the plaintiffs failed the public function test because the governmental action (flying missions for the Air Force) was unrelated to the unconstitutional conduct (termination without notice). While the plaintiffs had focused on military-related duties as support for the function test, the court noted that "[t]he alleged unconstitu-

tional conduct in this case does not arise from or pertain to [CAP]'s non-combat air mission. Rather, the specific acts concern personnel matters in the supervision, discipline, and firing of [CAP]'s employees." *Id.* at 1312. The court concluded that "the type of internal administrative/personnel issues at issue in this case are exactly the type of decisions that do not satisfy the public function analysis." *Id.* at 1313. Similarly, in this case, UM serves a public function, but the action about which the plaintiffs complain concerns personnel matters, which do not satisfy the public function test for state action. As such, the plaintiffs cannot meet the public function test.

■■■ **State Compulsion Test:** "The state compulsion test ... limits state action to instances in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *Nat'l Broad. Co.,* 860 F.2d at 1026. To sustain a § 1983 action under this test, Allocco must show that the City "exercised coercive power or ... provided significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Rendell,* 457 U.S. at 839, 102 S.Ct. 2764. Courts also analyze the following factors: (1) private dependency on the public entity for funding, *see Rendell,* 457 U.S. at 840–41, 102 S.Ct. 2764; and (2) the extent of the public entity's regulation of the private entity, *see Blum v. Yaretsky,* 457 U.S. 991, 1009–11, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

In *Rendell,* the Court addressed whether a private agency, which was subject to substantial state regulation in educating maladjusted teenagers and which received "virtually all of [its] income ... from government funding" engaged in state action when it terminated teachers and a vocational counselor. *Rendell,* 457 U.S. at 840–41, 102 S.Ct. 2764. The Court found that the decisions to discharge the plaintiffs "were not compelled or even influenced by any state regulation". It also noted that the power to approve persons hired as counselors was "not sufficient to make a decision to discharge, made by private management, state action." *Id.* at 841–42, 102 S.Ct. 2764.

The Eleventh Circuit relied on this rationale in *Nail v. Community Action Agency of Calhoun County,* 805 F.2d 1500 (11th Cir.1986), when it held that a private agency's termination of a teacher under the Headstart Program did not constitute state action. *Id.* at 1502; *see also MacDonald v. Eastern Wyo. Mental Health,* 941 F.2d 1115, 1118 (10th Cir.1991) ("Absent any showing that the state directed, controlled, or influenced this particular personnel decision", proof that the private agency was subject to pervasive state regulation and monitoring of its personnel standards and received substantial state funds was not sufficient to show state action.).

■■■ Although the City does not provide any funding to UM for the operation of its facility, and the City does not directly regulate UM's operations, the City does retain some control over UMPSD's police and hiring activities. Otherwise, the defendants' relationship would constitute an unconstitutional delegation of police authority. *See* Def. Reply at 57. This oversight, however, does not amount to coercive power or significant encouragement. As discussed earlier, the City had no rule or regulation that required UM to suspend or terminate the plaintiffs from their employment, and the City did not participate in the investigation or decision-making

process. The defendants' agreement even stated that UM police officers would "be disciplined by the University". (Def.Ex. 22). The outcome of the compulsion test would be different if there was evidence that City supervisors were pressuring UM to terminate the plaintiffs, had provided oversight to the employment decision, or otherwise participated in the termination, but the record is devoid of such proof. As in *Rendell*, the most intrusive personnel policy that the City promulgated was its right to approve persons hired as UM officers, but this fact does not compel a finding that the plaintiffs have satisfied the compulsion test. As such, the plaintiffs' state action argument fails under the state compulsion test.

 **Nexus/Joint Action Test:** The third test devised by the Supreme Court for establishing state action is the nexus/joint action test, which limits state action to instances in which "the State has so far insinuated itself into a position of interdependence with the [private party] that it must be recognized as a joint participant in the challenged activity". *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir.2000); *see also Nat'l Broad. Co.*, 860 F.2d at 1026–27. "To sustain a § 1983 claim under the nexus/joint action test, a symbiotic relationship between the public and private entities must involve the alleged constitutional violation." *Patrick*, 201 F.3d at 1316. In determining whether a public and private entity are so intertwined as to render them subject to § 1983 liability, courts evaluate such factors as whether: (1) the public and private entities are separate and distinct under the law; (2) the private entity had discretion to hire and fire employees; (3) the private entity was responsible for maintenance and repair of its own facilities; (4) the private

entity had the right to make its own rules and regulations; (5) the private entity agreed to indemnify the public entity from liability; and (6) the private entity leased property from the public entity. *Rendell*, 457 U.S. at 842–43, 102 S.Ct. 2764 (identifying factor six); *Patrick*, 201 F.3d at 1315 (identifying factors one through five).

 The plaintiffs in this case cannot show that these factors satisfy the nexus/joint action test. The City and UM are distinct and separate legal entities. UM has the authority to hire and fire its own employees, notwithstanding the fact that the City also participates in the hiring process. UM maintains and repairs its own facilities. Although UM police officers may have to follow CGSOPs, UM also makes its own personnel rules, regulations, and SOPs. UM has agreed to indemnify the City as to any liability the City may incur as a result of its contract with UM. Finally, UM does not lease any land from the City for its operations. Because the plaintiffs cannot satisfy these factors, they cannot establish state action under the third test.

In their opposition to the defendants' summary judgment motion, the plaintiffs have not addressed the three tests discussed above. Instead, they devote a significant portion of their argument to attempting to show that the defendants are joint employers and that the City exercised control over UM. The plaintiffs contend that "[t]he acts of each Defendant become the acts of both Defendants as to employment related issues." Pl. Brief at 3, 5. Assuming, without deciding, that the City and UM were joint employers, the plaintiffs still cannot avail themselves of this fact to impose liability under § 1983. This is because joint employment is not a pertinent consideration in deciding wheth-

er a private employer engaged in state action when it terminated an employee. The Supreme Court has approved of only the three tests discussed above to find that a private employer is a state actor under § 1983 because, in order to impose liability upon a government entity for a constitutional deprivation, a higher level of culpability than vicarious liability is necessary. *See George v. Pacific–CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996) (stating that relevant inquiry is "whether [private entity's] role as an employer was state action); *Gorenc v. Salt River Project Agric. Improv. & Power Dist.,* 869 F.2d 503, 509 (9th Cir.1989) (finding that, while defendant was state actor for some purposes, it was a private actor when it terminated its employees). The plaintiffs' failure to satisfy any of these three tests renders them unable to establish state action. This failure, in turn, prevents them from imposing liability upon the City for UM's employment actions against the plaintiffs. Accordingly, the City is entitled to summary judgment on counts II, VII, and IX of the fifth amendment complaint.

## 2. First Amendment Claim

■ This order extensively discusses why the plaintiffs' failure to prove state action undermines their constitutional claims. Even if the plaintiffs could establish state action, however, the City still would be entitled to summary judgment on the plaintiffs' First Amendment claim. In order to establish a First Amendment violation by a government employer, a plaintiff must show that: (1) the speech involves a matter of public concern; (2) the employee's interest in speaking outweighs the government's interest in efficient public service; (3) the speech played a substantial part in the challenged employment decision; and (4) the government would

have made the same employment decision in the absence of the protected speech. *See Martinez v. City of Opa–Locka,* 971 F.2d 708, 712 (11th Cir.1992); *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989); *MacLean v. City of St. Petersburg,* 194 F.Supp.2d 1290, 1301 (M.D.Fla.2002).

■ The plaintiffs cannot satisfy any of these elements. First, their statements cannot be characterized as matters of public concern. In their response to the City's motion for summary judgment, the plaintiffs base their First Amendment claim on the April 7, 1998 Offense Incident Report regarding the radio system, a complaint to the FDLE, an article in *The New Times* mentioning Allocco, and communications to the CALEA. Although these complaints were marginally related to the public interest, in that the public has a general concern with seeing that its police force is run effectively, the "main thrust" of the complaint was motivated by the plaintiffs' personal desires to obtain the benefits of City employment. *See Maggio v. Sipple,* 211 F.3d 1346, 1352 (11th Cir. 2000) (stating that court must examine speech in light of all the circumstances in order to determine its "main thrust"). Speech that is more motivated by an employee's personal issues is not a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("speech ... motivated by personal concerns instead of public concerns ... is not protected by the First Amendment"). Because the speech alleged by the plaintiffs to be protected was related primarily to their discipline, equipment, benefits, employment matters, and lawsuit, the court cannot find that it was of public concern.

■ Even if the plaintiffs' speech was protected, the balance of interests weighs

heavily in favor of the City. As discussed in relation to the whistleblower claims, the Eleventh Circuit recognizes that a police department is a quasi-military organization that must be afforded a heightened interest in the performance of its services. *See Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293–94 (11th Cir.2000) (denying First Amendment protection to police officer's speech involving coworkers' record tampering where speech was disruptive to efficient operation of police department); *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir.1994). It is against this backdrop that the plaintiffs' employment-related statements must be weighed. Additionally, the evidence shows that the plaintiffs' questioning of the police departments' activities were often done in a careless and reckless manner. For example, Fernandez's statements about reports of crime statistics were based on hearsay, not first-hand knowledge. (Fernandez Depo. at 815–30). Allocco also has admitted that he has no personal knowledge of some of the facts underlying the allegations he was making. Under such circumstances, the government's interest must outweigh the employee's interests when the employee knew or was reckless in not knowing that his speech was false. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1567 (11th Cir.1989) (stating that police captain's bitter complaints to all who would listen severely undermined morale of police department and substantially interfered with police department operations); *Bylsma v. Bailey*, 127 F.Supp.2d 1211, 1219–20 (M.D.Ala.2001); *Dressler v. Jenne*, 87 F.Supp.2d 1308, 1320 (S.D.Fla.2000) (holding that if public employee lies or is reckless with regard to truth when he makes statements about government corruption, the employee's speech is not protected by First Amendment).

The final elements of a First Amendment claim inquire into the existence of a causal link between the speech and the retaliation and whether the same employment decision would have been made regardless of the plaintiffs' speech. As discussed in relation to the whistleblower claims in section IV, A, 5, above, the plaintiffs cannot satisfy these requirements. This is particularly true when one considers that some of the documents signed by the plaintiffs that allegedly constitute protected speech also were signed by numerous officers that continue to be employed by UM. *See Butler v. City of Prairie Village*, 172 F.3d 736, 746 (10th Cir.1999) (finding that plaintiff's reporting of thefts was not motivating factor in his termination because other employee who also reported thefts was not terminated); *Gainer v. City of Winter Haven*, 170 F.Supp.2d 1225, 1231–32 (M.D.Fla.2001) (holding that plaintiff's speech had no connection to termination because other employees spoke up and were not terminated). Even plaintiff Garcia–Montes was a signatory to these documents. Under these circumstances, UM's termination of the plaintiffs cannot be found to be actionable under the First Amendment.

### C. Due Process Clause of Fourteenth Amendment

Count VII of the fifth amended complaint is for deprivation of due process in violation of the Fourteenth Amendment. This claim fails because, as stated in section IV, B, 1, above, the plaintiffs cannot establish state action. Even if this were not true, count VII still would fail because the plaintiffs cannot show a deprivation of a property interest. In count VII, the plaintiffs seek relief for a deprivation of procedural due process, not substantive due process. In order to prevail on a

procedural due process claim alleging a deprivation of a property interest, the plaintiffs must prove: (1) a constitutionally protected property interest in their employment; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of state procedures accompanying the alleged deprivation. *See Bank of Jackson County v. Cherry*, 980 F.2d 1354, 1357 (11th Cir.1992).

■ The plaintiffs cannot establish the first element of their due process claim because they do not have a constitutionally protected property interest in public employment.[34] *See McKinney v. Pate*, 20 F.3d 1550, 1559 (11th Cir.1994). The plaintiffs also lack a property interest in their employment by UM because it is undisputed that they were at-will employees, and at-will employees have no property right in their employment. *See Bishop v. Wood*, 426 U.S. 341, 345–47, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Susanno v. Lee County Bd. of County Comm'rs*, 852 F.Supp. 980, 986 (M.D.Fla.1994) (finding that, under Florida law, at-will employees do not have a property interest in their employment).

There is an exception to this rule if the state or employer provides "something more than an at-will relationship". *McMahon v. City of Edgewater*, 60 F.Supp.2d 1281, 1284 (M.D.Fla.1999). In their response to the City's summary judgment motion, the plaintiffs suggest two sources of a property interest: (1) the Police Officer Bill of Rights, Fla. Stat. § 112.532 and (2) the contract between the City and UM. By its terms, the Officer Bill of Rights applies only to "full time law enforcement officers, as defined by Fla.

Stat. § 934.10. As extensively discussed in the earlier part of this order, for purposes of Fla. Stat. § 934.10, the plaintiffs are classified as "part-time law enforcement officers". Because the court cannot pass upon the propriety of this designation, for purposes of this order, the court must accept this classification. As "part-time law enforcement officers", the plaintiffs cannot claim protection under the Officer Bill of Rights. *See Smith v. Town of Golden Beach*, 403 So.2d 1346, 1347–48 (Fla. 3d DCA 1981) (finding that individual employed by town as probationary officer was not employed "full time" and could not claim application of Officer Bill of Rights). As such, this statute does not create a property interest in their employment.

The plaintiffs' argument that the City– UM contract gave them a property interest in their position also fails. Although the contract states that "the Chief of Police of the City will have the right to revoke the *oath of office* of any Police Officer for just cause," it does not state that *employment* can be revoked only for just cause. (Def.Ex. 22). This language does not create anything greater than at-will employment. Moreover, the plaintiffs' complaint and opposition brief complains only about the revocation of their employment, not their oath.

■ The third element of a procedural due process claim requires the plaintiff to prove the inadequacy of the available state remedies. The fifth amended complaint does not allege that Florida's remedies are inadequate. Additionally, the plaintiffs have not introduced any evidence to show that UM's termination procedures or Florida's remedies were inadequate. *See Bank*

---

**34.** Public employment is discussed in this analysis because the plaintiffs bring their due process claim against the City, which is a public employer.

of *Jackson County v. Cherry*, 980 F.2d 1354, 1357 (11th Cir.1992) (stating that essential element of procedural due process claim is "the constitutional inadequacy of state procedures accompanying the alleged deprivation"). In fact, the record suggests that the plaintiffs failed to take advantage of the opportunities given to them, for they refused to meet with UMPSD Director Christensen to discuss the circumstances that resulted in their termination, and they did not utilize UM's grievance procedure. These alternatives offered the plaintiffs the opportunity to be heard prior to termination, which is all the predeprivation process that is required. *See McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir.1994) (stating that predetermination due process simply requires that plaintiff have notice, explanation of evidence, and opportunity to present "his side of story"). Because procedures were available to the plaintiffs, but they did not take advantage of them, the plaintiffs cannot now validly argue that they have been deprived of their property interests. Accordingly, the City is entitled to summary judgment on count VII.

For all of the foregoing reasons, it is hereby:

**ORDERED AND ADJUDGED THAT:**

1. The defendants' motion for summary judgment (DE # 213) is GRANTED.

2. The Clerk of the Court shall DISMISS AND CLOSE this case.

3. All pending motions are DENIED AS MOOT.